Chief Justice Collett
delivered the opinion of the court:
The complainant contends that the defendants who transferred stock to the bank in payment of their debts, under the resolution of September, 1818, or of May, 1821, and who were solvent at the time they made the transfers, were unauthorized to do so; that the directors, by the charter, were not authorized to receive stock of solvent persons in payment of their debts, because it was a withdrawal of so much of the capital stock of the company. He also contends that the transfers were permitted and made fraudulently; that the purchase of the six hundred shares'of stock by Barr and his return of it to the bank were fraudulent; that, by the withdrawal, he took from the company so much of its capital stock, which the directors could not authorize.
*224 As to the authority of the directors to receive the stock of the company in payment of the debts of the stockholders. This company was incorporated on April 15, 1803, .its charter to continue until May 1, 1843. The ostensible object of those who obtained the charter, was to purchase the agricultural and manufactured products of the country, and to transport them to foreign markets; hence the name, “Miami Exporting Company.” Section 6 of the charter authorizes the appointment of agents and the making of shipments. By section 8, the company is required to vest in produce and manufactures at least one-half of the cash received on shipments. Their real object was banking; and the directors were, by the charter, designedly given most extensive powers over the funds of the company, so as to authorize them to employ the 219] whole in business other than that apparently intended *as the sole object of the incorporation. By section 5 of the charter, it is provided that the president and directors shall open and continue their office in the town of Cincinnati, “ and shall have the sole management of the funds." By section 6, the president and directors are authorized “ to dispose of the funds of the company in such manner as they shall think most advantageous to the company.” The directors are here undoubtedly authorized to cease merchandising, and to dispose of the funds of the company in banking, in discounting notes and bills of exchange, if they think it “most advantageous.” They are as undoubtedly authorized to dispose of their funds, and to employ their agents in buying and selling the stocks of other corporations, if they think this “ most advantageous.” It appears from the testimony in the case, that they were at one time largely and profitably employed in buying and selling the stock of the Bank of the United States. If they could so vest their funds, why have they not power to buy and sell their own stock, if they “think it most advantageous to the company?” We think they have such power; and having it, they may fix the price, the mode of purchase, and of payment. They can purchase at auction, by private sale, for cash, or notes, or other property, or on credit; or can take it in payment of debts due from stockholders, whether solvent or insolvent. To take it of solvent stockholders in payment of debts, might be more advantageous to the company than to pay for it in cash or good bills. We do not see that a purchase must necessarily be fraudulent, or that a purchase in any of these modes is necessarily *225 a withdrawal of so much of the capital stock of the bank. When it is transferred to the bank, it becomes the property of the bank, of the remaining stockholders in proportion to their individual stock, to be managed for them by the directors, as the other stock. It is there for creditors, as much so as before the transfer; the capital stock is not lessened. On a division of the profits, the dividends which would have been assigned to the owner of the stock, had he not transferred, would be assigned to the bank, and held as other corporate property by the stockholders who had not transferred. Whether this is done by calculating the dividend on the whole stock of the bank, and then dividing the sum set apart for the stock assigned to the bank, among the holders of stock who had not transferred; pr whether, by one operation, the whole sum to be paid, in dividends, is divided among those who had not transferred, the result would *be the same. The [220 directors took the first method in apportioning the dividends, as to the stock transferred to the company in 1816, and the last as to the stock transferred under the resolution of 1818. There has been no dividend declared or paid by the bank since the transfers under the resolutions of May, 1821. The last dividend was in April, 1821. O. M. Spencer, president of the company when these resolutions were passed, testifies that the reason for passing the resolution of 1818 was to collect the debts of the bank, to lessen the stock, and thereby increase the dividends of those who did not transfer. The directors, in 1823, when they consolidated the stock, did not notice that owned by the company. The reasons which induced the directors to purchase, or the manner in which they treated or disposed of the stock, can not affect the seller. The transfer neither destroyed nor lessened its value. If the directors, when the transfers were made, charged the amount to the contingent fund, the dividends of the remaining stockholders were immediately increased as much as though the stock had been lessened so much; if not, and it was taken from the current profits of the bank, the first dividends would be diminished, but the subsequent ones increased. If no charge was made to any fund, the stockholders received too great a dividend, and thus withdrew so much of the capital stock. If so, Taylor, who received his dividends as long as any other stockholder, has no reason to complain of those who transferred, if the transfers were made in good faith. The answers all deny that they were fraudulent, *226 and there is no proof of their being so. The stock was selling at from five to ten per cent, above par in August, 1818. In September after, the bank was embarrassed by its debts, due to the United States Bank; most of the stockholders were indebted to the bank and embarrassed, and many were insolvent. The directors, under these circumstances, resolved to take its own stock, at par, from those indebted to the bank. This resolution was known to the stockholders generally. Taylor himself was informed of it by the president of the bank, and of the reasons for passing it. He then owed to the bank the debt which he now owes; stock was then selling at par. It was nearly four months after, before more than three thousand dollars woi’th of stock was transferred in payment of debts. If fraud was designed, why did not those who intended it, avail themselves of the opportunity offered to commit it? All the other banks in the city resorted to the same expedient to sus221] tain their credit. *The directors who passed the resolutions of 1818 must have been stockholders. Seven of the eleven directors, who constituted the whole board, had been continued in the directory from 1816. Ten of them were re-elected in 1819, and nine in 1820. If the resolution of 1818, and the transfers made under it, had been a fraud on the other stockholders; or if, under the circumstances of the bank, its passage and continuance in force for near a year had manifested even a want of ordinary judgment, so large a proportion of these directors would not have been elected in 1820.
The resolution of 1821 authorized any shareholder to assign half his stock in payment of his accommodation notes. It was repealed two months after its passage. The stock was to be taken at par; it had then fallen below par, but less than the notes of the bank in which these debts were payable. That many who transferred stock were solvent, and by the transfer did better for themselves than those did who retained their stock, is now manifest, but we can not infer from these premises that the transfers were fraudulent. The bank had, years before, imprudently extended its discounts and issues of paper; it had not reserved a sufficient contingent fund, but had probably paid too large dividends; undisclosed frauds may'have been practiced. It was failing, and the directors resorted to these expedients to save it. Directors of other banks resorted to the same, but they had not that effect. Events have shown that they were, perhaps, unwise. But it *227 would now be manifestly unjust to compel those who transferred under these resolutions to take back their stock and pay the debts for which it was transferred, to relieve the stockholders who did not think proper to transfer. The stock has since fallen and our currency become good. These stockholders, as to these shares, have not since had any representation in the directory of the bank. Why did not Taylor transfer? He knew of the resolution of 1818, and he then owed the debt to the bank for which he is now pressed. He probably believed that the bank, by the measures it was taking, would be able to declare large dividends; to resell the stock it was taking in at an advance, and that therefore it would be better for him not to transfer. In 1820 he voted for nine of the eleven directors who passed the resolution of 1818.
When it-has turned out that those who transferred their stock in payment of their debts have done better by disposing of it than he has by retaining his and not paying his debt, *would it [222 not be palpably unjust to set aside these transfers for his relief, on a bill filed in 1828, nine years after they were made and had come to his knowledge? A principal who knows of a transaction of his agent, in which he exceeds his authority, and does not promptly disavow it, can not afterward do so, because it would injure unjustly him with whom the agent dealt. This is no arbitrary principle, confined to one class of agents or cases. It applies wherever injustice would be done without it. If a man sees a stranger selling his property, and does not set up his claim, the title passes to the purchaser. The directors, when dealing with one of their own body, or any other stockholder (which' is an every-day occurrence in all banks), are the agents of the stockholders as a body. The stockholder, in such a transaction, stands as a stranger to the corporation, and is subject to the same liabilities, and is undoubtedly entitled to the benefit of every principle of law or equity for his protection against the injustice of the corporation, or any of its members, of which a stranger could avail himself.
As to the six hundred shares purchased by Barr of the president and cashier of' the bank, on the day before the election of directors in May, 1821, and relinquished on the 5th of June next after, one hundred and sixtv-three of these shares were of old stock, transferred to the bank under the resolutions of 1818 and 1821. We have just decided that the directors had the right to purchase their own stock whenever they thought it would be beneficial to *228 the bank ; if so, they undoubtedly had a right to rescind an unexecuted contract to sell, and to return the purchase money with the consent of the purchaser. The certificates for the stock had not been delivered.
Thirty-four of the new shares sold to Barr did not belong to the bank at the time of the sale; they had been before sold; the sale to him of these shares was therefore void. The other new shares were sold to Barr by the president and cashier without any other authority from the directors than that contained in the resolution of' May 3, 1814. By that resolution, a sale made by the officers was required to be submitted to the directors for their confirmation. No entry of this sale had been made in the books of the bank; no certificates had issued. The directors, it seems to us, had a i’ight to set aside this sale; it was contrary to the policy which appears to have been pursued by the directors from the passage of the resolution of 1818, to buy and not to 223] sell stock. The resolution of May, 1821, to ^receive stock in payment of debts, had been passed but a few days before, and was then in force. How, then, could the president and cashier make a sale and expect an approval? The bank had before sold more than five hundred thousand dollars worth of stock, to which sum it is claimed its capital stock was limited by the charter. If this was the case, it was the duty of the directors to disaffirm the sale. If they have done thus, can the court set it up ?
Riddle had nothing to do with this transaction. He did not vote the one hundred shares purchased in his name. Barr, Sterret, Perry, and Griffin were in the directory, composed of eleven members. The other seven directors are not to be presumed to have acted fraudulently when the purchase was rescinded, because four or five of the board were interested. Directors of all banks are called upon from day to day to decide upon the cases of their co-directors. But independent of this, these shares were taken by Barr, to be voted on the next day for directors of the bank, against the John H. Piatt ticket. Barr, Griffin, Patterson, Slerret, and Perry voted five hundred of these shares for all the directors who were elected. The lowest on this ticket had a majority over the highest in the opposition of more than five hundred votes, so that the dii’ectors elected were the same that would have been elected had none of these shares been voted. Afterward, the shares were *229 relinquished, and the money paid upon them received back by Barr, so that the bank was in precisely the same situation it would have been had not this transaction taken place. The directors were the same, the stock the same, in the same hands, of the same value. ■ Who, then, did it injure? How did it affect Taylor? If all the directors, and even Riddle, who would not vote his shares, were concerned with Barr in this transaction to affect the election (of which there is no evidence), they had their labor in vain. They neither benefited themselves nor injured others. If a person had lost by such a transaction, he would be entitled to redress ; no one would desire to gain. This affair, so far as Barr is concerned, is not to be commended, but censured. If it should be punished, this is not the place. A court of chancery gives relief to the injured only, if plain and adequate redress can nowhere else be obtained; and it gives it merely to the extent of the injury.
Upon the whole, the court are unanimously of opinion that the bill should be dismissed as to the corporation and the defendants *who transferred stock to the bank in payment of debts; [224 and a majority of the court are of opinion that it should be dismissed also as to Barr.