EDMOND B. BRONSON,
Plaintiff Below, Appellant,
*vs.*

BAGDAD COPPER CORPORATION,
a corporation of the State of Delaware,
Defendant Below, Appellee.

*Supreme Court on Appeal, May 28, 1959.*

*Aaron Finger* of Richards, Layton & Finger, Wilmington, for appellant.

*James M. Tunnell, Jr.* of Morris, Nichols, Arsht & Tunnell, Wilmington, for appellee.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

SOUTHERLAND, Chief Justice: This is a suit for the recovery of shares of treasury stock of Bagdad Copper Corporation, alleged to be held by the corporation as a quasi-trustee for the benefit of plaintiff and others.

The defendant, Bagdad Copper Corporation, is the successor of Arizona Bagdad Copper Company, which in 1927 was the owner of mineral lands and mining claims in Arizona. Arizona Bagdad lacked capital to develop the properties.

The plaintiff, Bronson, was in effect the promoter of a reorganization of Arizona. On January 7, 1927 he submitted to Arizona proposal to reorganize the enterprise and provide the necessary capital. Some days later a tentative contract between Arizona and Bronson was signed. It was subject to the approval of Arizona stockholders. Such approval having been obtained, another proposal was submitted to Bagdad Copper Corporation. It was approved by Bagdad's board and on March 7, 1927 a definitive contract was executed by Bagdad and Bronson.

This series of proposals and contracts constitutes in effect one contract and plan of reorganization of Arizona. The following are the pertinent provisions:

Arizona will convey all its mining properties to Bagdad. In payment therefor Bagdad will issue to Bronson or his nominees and assigns its entire capital stock, consisting of 4,000,000 shares of the par value of one dollar. Of these shares 1,200,000 shares are to be issued to Arizona stockholders in exchange for their Arizona shares; and 2,800,000 shares "will be presently contributed by the vendors of said property to [Bagdad] as a capital stock donation, and are owned and held by [Bagdad] for the uses and purposes set out in this agreement."

To provide funds for development work, Bagdad will grant to Bronson two options: (A) an option to purchase 600,000 shares of Bagdad stock for one dollar a share; and (B) a second option, effective only upon completion of the purchase under option (A) and the filing of a development report, to buy at 90% of par an entire issue of $15,000,000 of first mortgage bonds, and, if and when such bonds are purchased, to receive as a bonus in connection therewith the 2,200,000 shares of stock remaining out of the 2,800,000 shares above mentioned.

Bronson completed the purchase of the 600,000 shares covered by option A. However, the funds thus raised were insufficient for the

preliminary work and development contemplated by the contract, and option (B) was not exercised.

Accordingly, on September 5, 1929, Bagdad and Bronson entered into another contract, designed to facilitate additional financing. The introductory paragraph follows the general outline of the March, 1927 contract, including a reference to the 2,200,000 shares contributed as a capital stock donation and "held and owned by [Bagdad] for the uses and purposes set out in this agreement."

Paragraph II provides that upon Bronson's obtaining a firm underwriting of 200,000 shares of Bagdad stock at $3.50 the agreement shall become effective, and Bagdad shall deliver to Bronson a certificate for 300,000 shares; "and thereupon the original agreement [of March 7, 1927] shall be cancelled and shall be of no further effect or validity."

Paragraph V grants to Bronson (if he procures purchases for the 200,000 shares) the exclusive option to purchase, on or before July 1, 1931 (or within ninety days after the filing of a development report), all of the remaining 1,700,000 shares at the price of $5.00 a share.

Paragraph X provides that if Bronson shall complete the purchase of the 200,000 shares but shall not complete the option to purchase the 1,700,000 shares on or before July 1, 1931 (or within ninety days after the filing of the development report), "then this Agreement and all rights and options in respect to the one million seven hundred thousand (1,700,000) shares of the stock of the Corporation shall cease and determine, and the Corporation shall be entitled to the return of the certificates for such stock deposited in escrow."

By endorsement at the foot of the contract Bronson agreed to indemnify Bagdad and its directors against any loss or damage arising from the cancellation of the agreement of March 7, 1927.

Bronson arranged for the purchase of the 200,000 shares, but never took up the option to purchase the remaining 1,700,000 shares. (The development report was apparently never filed.) Later Bagdad obtained assistance from the Reconstruction Finance Corporation, and the 1,700,000 shares were not used to assist in the financing.

Upon these facts Bronson made below and renews here the following claim to shares of treasury stock still held by Bagdad:

The donation of 2,800,000 shares of Bagdad stock by the stockholders was subject to the condition that the shares should be used to assist in financing, "and not otherwise"; consequently, Bronson argues, the corporation did not hold them as ordinary treasury stock, but for the specified purpose only and as an asset of the donating stockholders held in a custodial or quasi-trust relationship. Therefore, says Bronson, when the shares were no longer needed to assist in financing a resulting trust in his favor (both personally and as a representative of the other stockholders) immediately arose. The 1929 contract, he argues, had no effect on the status of the shares, which continued to be subject to the terms of the 1927 contract which had created this status.

It is this alleged quasi-trust that Bronson seeks to enforce in this case. The Chancellor held that his complaint stated no case and granted Bagdad's motion to dismiss. Bronson appeals.

The case for the plaintiff, it will be observed at once, depends on two propositions: (1) that the 1927 contract created a quasi-trust of the donated shares; and (2) that the quasi-trust survived the 1929 contract. To succeed plaintiff must sustain both propositions.

The soundness of the first proposition is at least questionable. There is nothing unusual in the so-called "donation" of issued stock by promoters to supply an aid to financing. The purpose, of course, is to make the stock "treasury stock," i.e., stock issued and fully paid for and reacquired by the corporation, and thus freed from the requirement that par stock must be sold at not less than par. Indeed, this last attribute is the only substantial difference between treasury stock and authorized and unissued stock. See Ballantine, Corporations, § 260.

In the instant case Bronson, the promoter, placed a restriction on the resale of the treasury stock in that by the 1927 contract the stock was to be subject to two options designed to produce capital funds for development. It is certainly doubtful whether this restriction amounted to anything more than a covenant temporarily limiting the

scope of the directors' power of sale over the stock—a covenant apparently designed to protect Bronson as a supplier of capital. In that view Bronson's only right would be the enforcement of the covenant.

But we shall assume, without deciding, that the 1927 contract created in Bronson some special right or interest in the shares themselves. Even so, we are clearly of opinion that that interest did not survive the 1929 contract.

■ In the first place the 1929 contract is complete on its face. Upon its becoming effective the 1927 contract was cancelled and was "of no further effect or validity." Bronson's claim of interest in the donated shares is derived from the 1927 contract. It would seem to fall with the contract itself.

■ Second, the 1929 contract expressly provided that the 1,700,000 shares optioned to Bronson should be returned to the corporation if the option was not exercised—a provision certainly inconsistent, as defendant says, with the idea that the shares, if not used in further financing, should be returned to Bronson. Moreover, and even more important, it was expressly provided that if the option were not exercised, then the whole agreement "and all rights and options in respect to the one million seven hundred thousand (1,700,000) shares * * * shall cease and determine." (Paragraph X above quoted.)

We cannot see how any supposed interest of Bronson reserved in the shares by the 1927 contract can be said to survive these provisions. They declare, in effect, that if the 1,700,000 shares are not used for financing they revert to the corporation freed from any option or claim of Bronson of any kind. The Chancellor so held and we agree.

This holding is dispositive of the case.

■ Bronson contends that if the 1929 agreement effected a release of his alleged equitable interest in the donated stock the release was without consideration. We do not think so. Notwithstanding the fact that the bonus of 300,000 shares was connected with the cancellation of option B in the 1927 contract, the 1929 contract contained no

apportionment of the consideration. It must be viewed as a whole. The promises of one party were consideration for the promises of the other.

The judgment below is affirmed.