**PUBLIC INVESTMENT LIMITED,** Shareholder, Bandeirante Corporation, et al., appellants,

v.

**BANDEIRANTE CORPORATION, a D.C.** Corporation, et al.

No. 83–1067.

United States Court of Appeals, District of Columbia Circuit.

Argued 1 Nov. 1983.

Decided 3 Aug. 1984.

John Mark Jansen, Washington, D.C., for appellants.

Richard Stahl, Fairfax, Va., for appellees.

Before TAMM, WILKEY and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

Opinion concurring in part, dissenting in part, filed by Circuit Judge MIKVA.

WILKEY, Circuit Judge.

In December 1980, Philander P. Claxton III organized Bandeirante Corporation, whose principal business was to develop gold mines located in the foothills of the Bolivian Andes. In September 1981, Bandeirante officers Sparkle Diamond and Sharon Smith authorized the sale of virtually all of the corporation's voting stock for $999,000 in promissory notes tendered by Claxton on behalf of Nilge, Ltda. In August 1982, Claxton called a Bandeirante shareholder's meeting at the District of Columbia jail, and cast the proxy of Nilge, Ltda., in order to elect a new slate of officers and directors.

The appellants in this case seek to unseat these officers and directors. To do this, they challenge the validity of the corporation's sale of its stock to Nilge, Ltda. They advance two arguments as to why the sale should be voided. First, they argue that the District of Columbia law specifically forbids corporations to sell stock for promissory notes. Secondly, they claim that Claxton, owing a fiduciary duty to Bandeirante, was obligated to show that the transaction with Nilge was totally fair.

The district court held against the appellants on both arguments. We reverse.

## I. BACKGROUND

The rather unusual facts of this case are somewhat blurred around the edges.[1] The record shows, with varying degrees of reliability, references to fabulously rich South American gold mines, a shareholder's meeting held in a jail cell, a complex web of interlocked business entities, and a struggle for control of one of those business entities, Bandeirante Corporation.

The events giving rise to this case apparently began when Philander P. Claxton III became interested in developing gold mining properties located near the town of Tipuani in Bolivia. According to testimony Claxton gave at trial, an initial investigation of gold mining opportunities led him to

---

1. This appeal involves only the equitable relief sought by plaintiffs. All claims for damages were reserved for another trial.

one Gilkey, who claimed to hold title to gold mining concessions in Bolivia worth as much as $100,000,000.[2]

In December 1980 and January 1981 Claxton organized a network of business ventures to exploit the gold mines. The most central of these was Tipuani Limited Partners, which was to serve as the vehicle for the distribution of proceeds from the gold mines. Limited partnerships in Tipuani were sold for cash and notes totaling about $7,000,000.

Claxton formed Bandeirante Corporation to be the general partner for Tipuani.[3] Bandeirante was authorized to issue 10,000 shares of Class A voting stock and 10,000 shares of Class B nonvoting stock.[4] The 10,000 Class A shares were initially issued for $15,000 to Mr. and Mrs. Donald Loveridge, wealthy individuals residing in Florida who were interested in the Bolivian venture for tax advantages and investment. This stock was repurchased two months later, however, when the Loveridges indicated that they did not wish directly or indirectly to control the operations of the corporation.[5] The repurchase of the Loveridge's stock apparently left no voting stock outstanding.

About half of the Class B nonvoting shares appear to have been sold to Claxton's wife, Susan Williams, in return for her conveyance to the corporation of a tract of land and a residence in Virginia.

Another 3500 Class B shares were sold to the plaintiffs in this case for $350,000.[6]

The original directors and officers of the corporation were drawn from the law firm Claxton retained to organize Bandeirante.[7] These officers and directors were soon replaced with two acquaintances of Claxton's —Sparkle Diamond, president and treasurer, and Sharon Smith, vice-president and secretary.[8] According to uncontroverted testimony given by Claxton at trial, Diamond and Smith were not actively involved in the operation of the corporation, but merely followed such directions as Claxton gave them.[9] Claxton did not at this time take a formal management position in the company, but instead was hired as a consultant, receiving a payment of $3,000 per month.[10]

Claxton completed the network with an off-shore corporation, Nilge, Ltda., which apparently was formed while Claxton was imprisoned at Eglin Air Force Base in January of 1981. (Nilge is Eglin spelled backwards.)[11] Claxton testified at trial that this third business entity was established offshore in order to avoid United States taxes on operations conducted overseas. The record does not state whether Claxton informed the plaintiffs of Nilge's role in the venture. Claxton testified at trial that he did not hide his involvement in Nilge,[12]

---

2. Supplemental Record on Appeal, Hearing of 17 November 1982 at 172. Claxton testified at the same time, somewhat contradictorily, that the worth of the mines had been set at $10 million and $20 million. *Id.*

3. District Court Op. at 2.

4. *Id.* The par value for all shares was $1.

5. *Id.* at 2–3.

6. Joint Appendix, Volume II [JA II] at 70. In an affidavit entered in this case, Claxton stated that the investors in the Class B shares were told at the time of their investment "that they would have protection as Class B shareholders because the assets of Bandeirante would be used to repurchase their shares if the mining project were not successful." Affidavit of Philander P. Claxton III, Record on Appeal at 47.

7. The original directors were Patrick J. Moran, Cecilia Hathaway and David Frantz. JA II at 105.

8. *Id.* at 121. Claxton met both Diamond and Smith at the National Legal Aid and Defenders Association, where Diamond was an administrative assistant and Smith a secretary.

9. District Court Op. at 3.

10. *Id.*

11. *Id.* The record does not show why Claxton was imprisoned at this time.

12. Supplemental Record on Appeal at 76–79.

while the plaintiffs argued that Nilge did not exist.[13]

The precise ownership of Nilge remains something of a mystery, although the trial court found that at the time of trial its shares were held by two Bolivian nationals involved in the gold mining venture.[14] The management of Nilge was less obscure, however—at all times relevant to this case, Claxton held a broad power of attorney from Nilge, and directed all of its actions in North America.[15]

Nilge—rather than Bandeirante—became the vehicle for Claxton's operation of the mining venture. Tipuani contracted with Nilge for certain management services, paying in part with promissory notes received by Tipuani from its limited partners. Claxton testified at trial that he had performed these management services.[16]

Reviewing this network of business entities, the district court found that Claxton was "promoting every aspect of the venture." [17] Claxton initiated and directed the organization of Tipuani, Bandeirante and Nilge; in his role as consultant to Bandeirante and agent of Nilge he oversaw all actions taken by any part of the enterprise.

A major problem soon befell the gold-mining venture—it was learned in the spring of 1981 that the title to the mining property was not clear. A rival group filed a competing claim to the property, and litigation ensued to determine the right owner.[18]

In the wake of the disclosure that the mining claim might prove worthless, certain of the limited partners began in the summer of 1981 to skip payments on promissory notes owing to Tipuani Limited Partners. Claxton explained at trial that he did not press for payment on these notes, because of the problems surrounding the title to the mines.[19]

In September of 1981, Nilge used $990,-000 of the promissory notes it had received from Tipuani to purchase Class A shares in Bandeirante that had been returned by the Loveridges. This transaction shifted effective control of the mining operation to Nilge, by making Bandeirante a Nilge subsidiary. Nilge, in turn, was controlled in its North American operations by Claxton. By this complex series of transactions, as the district court found, "Claxton III without expenditure of any of his funds controlled Bandeirante, controlled the management of the mining venture and from time to time adjusted the interests of the parties to suit his purpose." [20]

Soon after the sale of the voting stock to Nilge, Diamond and Smith asked to step down as officers and directors of Bandeirante.[21] By January 1982, they were replaced by John Baringer as president, Claxton as secretary, and Michela Perrone as vice-president. The new directors were Claxton, Baringer and Perrone. At that same time, Claxton resigned as consultant to the corporation.[22]

---

**13.** District Court Op. at 3.

**14.** *Id.* Claxton testified at trial, however, that the Bolivian nationals who held the Nilge stock would return the stock to Claxton and the Loveridges "once production actually began" at the gold mine. Supplemental Record on Appeal, Hearing of 17 November 1982 at 169. This would appear to give Claxton an ownership interest in Nilge, and hence would appear to provide a source of another potential conflict of interest. This potential conflict is not, however, relevant to our decision today.

**15.** District Court Op. at 3.

**16.** Supplemental Record on Appeal, Hearing of 17 November 1982 at 159, 164.

**17.** District Court Op. at 3.

**18.** Supplemental Record on Appeal, Hearing of 18 November 1982 at 18.

**19.** *Id.* at 36, 84–86.

**20.** District Court Op. at 4.

**21.** A set of corporate minutes indicates that Sparkle Diamond wished to resign as president of the corporation "because of an investigation of the corporation's checking account being conducted by the United States Attorney's office for the District of Columbia." JA II at 129. The investigation was apparently an outgrowth of the other charges against Claxton. No charges seem to have been brought due to the investigation of Bandeirante.

**22.** *Id.* at 134.

Sometime in early 1982, Claxton was indicted on serious federal felony charges which implicated him in fraudulent conduct not directly related to Bandeirante. Claxton pled guilty to those charges, and was sentenced to a long prison term.[23]

After his appointment as president, Baringer began raising questions concerning Claxton's operation of Bandeirante.[24] These questions concerned expenditures made by Claxton involving property owned by Claxton's wife, Susan Williams, and Claxton himself. Baringer contacted both the Loveridges and the appellants, who became aroused by the developing course of events.[25] Claxton, meanwhile, objected to Baringer's operation of Bandeirante.

While confined to the District of Columbia jail awaiting designation to a penitentiary, Claxton acted to remove Baringer from the presidency of the corporation. He used his power of attorney from Nilge to grant himself—through a transaction involving a woman who had no connection with Nilge —Nilge's proxy.[26] Claxton then used the proxy to call a shareholder's meeting, which he held at his cell in the jail.[27] Claxton elected himself, his wife Susan Williams, and his father, Philander P. Claxton, Jr., the president, secretary/treasurer, and vice president, respectively, of Bandeirante. He also elected himself, his father, and George Kloosterhouse (a representative of the Class B stockholders) the directors.[28]

The appellants seek to undo this election by undoing the sale of the Class A stock to Nilge. They advance two principal theories: that the sale to Nilge is void because promissory notes do not constitute a valid

form of payment for the shares, and that the sale is void because Claxton failed to show "the entire fairness and adequacy of the consideration" for the sale.

## II. TREASURY STOCK ISSUE

### A. *The Developing Concept of Treasury Stock*

The term "treasury stock" has arisen to describe shares of a corporation which are sold to investors, then reacquired and held by the corporation. The trial court below found that Nilge, Ltda., acquired treasury stock—and that promissory notes are acceptable consideration for treasury stock.[29] The case in the trial court thus turned on the treasury stock issue.

#### 1. The Common Law View

For generations, the notion of treasury stock has teased lawyers' minds. Although the concept has been around for more than a hundred years, commentators and courts have continued to debate the legitimacy and wisdom of the device.

One view—still the rule in Britain—considers it a logical necessity that the shares should be extinguished when reacquired by the corporation, and that any subsequent replacement by newly issued shares. Under this view, the power of the corporation to reacquire shares is a function of its power to reduce its capital. The logic underlying this view was ably expressed by Professor Ballantine in his treatise:

Treasury shares are indeed a masterpiece of legal magic, the creation of something out of nothing. They are no

---

**23.** District Court Op. at 4.

**24.** *Id.*

**25.** *Id.*

**26.** *Id.*

**27.** *Id.* at 4. As the District Court opinion noted, Claxton informed the court through an *ex parte* communication that he held a similar shareholders' meeting in his cell at Allentown penitentiary, in which he took further actions affecting the rights of the Class B shareholders. Record on Appeal at 53. In the same *ex parte*

communication, Claxton also informed the trial court of a plan to trade the notes acquired from Nilge back to the limited partners in Tipuani for 45 Class A shares in Tipuani. Since the $990,-000 in notes originally had been exchanged for 66 Class A shares in Tipuani, the Tipuani limited partners would essentially acquire 21 Class A shares at no cost through this circular trading of the notes. Claxton nonetheless testified that this exchange would be of great advantage to Bandeirante, the general partner in Tipuani.

**28.** District Court Op. at 4–5.

**29.** *Id.* at 7.

longer outstanding shares in the hands of a holder. They are not outstanding because the obligor has become the owner of the obligation. . . .

Treasury shares carry no voting rights as to dividends or distributions. Their existence as issued shares is a pure fiction, a figure of speech to explain certain special rules and privileges as to their reissue. A share of stock, as we have seen, is simply a unit of interest in the corporate enterprise arising from a contract. When the holder of a share surrenders his rights to the corporation it is obvious that the contract is in reality terminated.[30]

Another view—which at the time the D.C. corporation code was drafted was the majority view in America—held that a corporation could own its own shares. This view held that treasury shares were not extinguished, but remained "in suspended animation—existing, but existing only in a kind of Limbo . . . ."[31] The "suspended animation" language reflected the fact that the corporation was not allowed to exercise certain rights of share ownership, such as the right to vote the shares or receive dividends.[32] For various reasons, the sale of treasury stock also was often free from restrictions attached to the sale of newly issued stock, such as par value requirements and pre-emptive rights of purchase.[33] States varied widely in the treatment of such shares, however; as one commentator concluded, "There seems to be little agreement as to the precise legal status of treasury shares."[34]

## 2. The Model Business Corporation Act

Into this state of confusion came the Model Business Corporation Act. The Model Act explicitly recognized the concept of treasury shares, defining them as shares that were "issued but not outstanding."[35] The Model Act placed restrictions on the ability of a corporation to reacquire its own shares, allowing only funds from surplus to be spent.[36] The act allowed the corporation's directors to resell the shares for such consideration expressed in dollars as they found adequate.[37] At the same time, the Model Act forbade the payment for securities by the corporation with certain types of consideration, including promissory notes.[38]

No draftsmen's comments exist for the early versions of the Model Act. Individual members of the committee that drafted the Model Act did publish articles which shed some glimmers of light. First, it was claimed that the draftsmen did not intend conceptually to rework corporate law, but only to codify existing law in a form that was more rational and more convenient.[39] Secondly, it was the aim of the Model Act's draftsmen to recognize the existence of treasury shares and to define them "so that the reader will know what [the drafts-

---

30. H. BALLANTINE, BALLANTINE ON CORPORATIONS 615 (1946). *See also* G. Glenn, *Treasury Shares,* 15 VA.L.REV. 625 (1929).

31. *Kirschenbaum v. Commissioner,* 155 F.2d 23, 25 (2d Cir.), *cert. denied,* 329 U.S. 726, 67 S.Ct. 75, 91 L.Ed. 628 (1946) (L. Hand, J.). *See also Taylor v. Miami Exporting Co.,* 6 Ohio 176, 219 (1833).

32. Note, *The Legal Status of Treasury Shares,* 85 U.PA.L.REV. 622 (1937).

33. *Id.*

34. H. OLECK, 3 MODERN CORPORATION LAW 705 (1948).

35. Model Business Corp. Act (1950 ed.) § 2(h).

The Model Business Corporation Act was first drafted in 1946. It was significantly redrafted in 1950. It has been periodically revised since, with annotated versions published in 1960 and 1971. In this opinion, the term "Model Act" will refer to the 1950 version as it appears at 6 BUS.LAW 1 (1950). The term Revised Model Act will refer to the Circulation Copy of the pending revision.

36. *Id.* § 5.

37. *Id.* § 17.

38. *Id.* § 18.

39. Garrett, *History, Purpose and Summary of the Model Business Corporation Act,* 6 BUS.LAW. 1, 3 (1950).

men were] talking about."[40] Finally, and very ambiguously, it was observed that the Model Act "prohibits the issuance of shares for promissory notes and future services."[41] This language does not reach treasury shares, which are defined as being already issued; the omission of treasury shares could be read as either being deliberate exclusion or careless oversight.

### 3. The District of Columbia Code

The D.C.Code provisions at issue in this case were derived almost verbatim from the Model Act. "Shares reacquired by the corporation" (the term "treasury stock" was not used) were defined as "issued but not outstanding" shares,[42] the corporation's directors were allowed by § 29–316(c) to resell the shares for such consideration as they found adequate,[43] but certain forms of payment (including, again, promissory notes) were specifically excluded as valid payment for the sale of shares by § 29–317.[44] The major deviation came in the Code's requirements for the corporation's repurchase of its own shares. The D.C. Code employed a more complex formula than did the Model Act, but the thrust of both was similar.[45]

No extensive legislative history exists for the D.C. Code. The official history that does exist reveals only two rather vague purposes: an intent to bring the antiquated D.C. corporation law somewhat up to date, and an intent to use the Model Act as a guide.[46] Additional unofficial legislative history suggests additional legislative concern—especially from the Delaware delegation—that the D.C.Code not be so liberal as to divert revenue from other jurisdictions.[47] The legislative history does not address the treasury stock issue at all.

### B. Promissory Notes and Treasury Shares

#### 1. § 29–317

The specific provision of the District of Columbia Code at issue—§ 29–317—is am-

(a) The consideration for the issuance of shares may be paid, in whole or in part, in money, in other property, tangible or intangible, or in labor or services actually performed for the corporation. When payment of the consideration for which shares are to be issued, which, in the case of shares having a par value, shall be not less than the par value thereof, shall have been received by the corporation, such shares shall be deemed to be full paid and nonassessable.

(b) Neither promissory shares nor future services shall constitute payment or part payment for shares of a corporation.

(c) In the absence of fraud in the transaction, the judgment of the board of directors or the shareholders, as the case may be, as to the value of the consideration received for shares shall be conclusive.

---

**40.** Garrett, *Suggested Revisions of the Model Corporation Act*, 5 Bus.Law. 24 (1949).

**41.** Garrett, *History, Purpose and Summary of the Model Business Corporation Act*, 6 Bus.Law. 1, 7 (1950). After the statute at issue here was adopted, articles were published criticizing the Model Act for its accounting treatment of treasury shares, *see, e.g.,* Rudolph, *Accounting for Treasury Shares Under the Model Business Corporation Act*, 73 Harv.L.Rev. 323 (1959), prompting a partial defense from one of the drafters of the Model Act, Garrett, *Treasury Shares Under the Model Business Corporation Act*, 16 Bus.Law. 916 (1960). The complex accounting problems raised by a corporation's purchase of its own shares, see W. Cary & M. Eisenberg, Cases and Materials on Corporations 1426–31 (1980), are not directly applicable to this case.

**42.** District of Columbia Business Corporations Act, D.C.Code § 29–302(9) (1981 ed.).

**43.** *Id.* at § 29–316(c). That provision reads:
(c) Shares of a corporation issued and thereafter acquired by it may be disposed of it for such consideration as may be fixed from time to time by the board of directors.

**44.** *Id.* at § 29–317. That provision reads:
§ 29–317 Same—Payment; Promissory notes and future services excluded

**45.** *Id.* at § 29–305. The corporation also has the power to repurchase shares to eliminate fractional shares, collect claims of the corporation, pay dissenting shareholders, and, under certain conditions, retire shares. *Id.*

**46.** H.R.Rep. No. 1552, 82d Cong., 2d Sess. at 2 (1952); 100 Cong.Rec. 7055–56 (1954).

**47.** Philipson, *Review of the New Corporation Law of the District of Columbia*, 10 Bus.Law. 24 (1955); Philipson, *The New District of Columbia Business Corporation Act*, 1954 D.C.Law. 499, 595 (1954).

biguous in its treatment of the treasury stock issue. The section bans the use of promissory notes as payment for stock. It can be argued that the promissory note restriction applies only to issuances of new stock: it occurs in a provision otherwise devoted to issuances of stock. In support of this approach, it also could be argued that the elimination of the "consideration" requirement for treasury shares in § 29–316 applies not just to the dollar amount of consideration, but to the type of property tendered as consideration.

Conversely, it can be argued that § 29–317 does not restrict the ban on promissory notes to "issuances," but applies by its terms to all situations where payment is being made to the corporation for shares. In support of this view, it can be noted that the "such consideration as may be fixed" provision of § 29–316(c) follows two other provisions relating to par value, and thus only codifies the common law rule that treasury shares could be sold by the corporation without regard to the stock's par value. More generally, it could be argued that § 29–316 as a whole aims at establishing the dollar value of the shares for the purpose of establishing the corporation's stated capital, while § 29–317 is an anti-fraud provision aimed at ensuring that the corporation actually receive a reliable type of consideration for its shares. Treasury shares appear to be excluded from the Model Act's treatment of stated capital, while no reason exists to think treasury shares should be excluded from the corporation's anti-fraud provisions.

### 2. Judicial Interpretation

The courts have not, to date, resolved the ambiguities left unresolved by the Code and the legislative history. The one case that deals at all with the provisions at issue here establishes only that the restrictions of § 317 apply only to sales of shares by the corporation itself—and not to "an assignment of those shares of stock already issued to and owned by an individual."[48] This result recognizes that the policies underlying § 317 do not apply when the corporate treasury is unaffected.

### 3. The Structure of the Act

The overall structure of the code does, however, reveal a coherent approach to the treasury stock question. An understanding of the role treasury stock plays in the District of Columbia statute must begin with the concept of stated capital.

Under most corporation statutes, the concept of stated capital plays a key role in the statutory provisions guarding against watered stock. The stated capital represents that portion of the corporation's assets held within the corporation to provide a "cushion" for creditors should the corporation fail.[49] Most corporation statutes—including the one at issue here—establish the stated capital account by reference to the issuance of stock by the corporation. The stated capital normally is at least initially derived from the aggregate par value of all shares sold (with adjustments made, of course, when no-par shares are issued).[50]

Under those statutes that recognize the concept of stated capital a valid distinction arises between treasury stock and newly issued stock. Most corporation statutes (again, including the one at issue here) forbid corporations to acquire treasury stock when such an acquisition would deplete the stated capital of the corporation. While considerable confusion exists, even today, as to the proper accounting procedures, one point is clear: with rare and minor exceptions,[51] any acquisition must be paid for from either capital surplus or earned surplus. A corporation cannot use

---

**48.** *Automated Datatron, Inc. v. Woodcock,* 84 F.R.D. 408, 411 (D.D.C.1979).

**49.** The older statutes thus forbade the payment of dividends when payment would diminish the level of the corporation's assets below the level of stated capital. *See* D.C.Code § 29–340 (1981 ed.).

**50.** *See id.* § 29–318.

**51.** *See id.* § 29–305.

its stated capital to trade in shares of its own stock.[52]

Given these facts, it would make little sense to insist on issuing treasury stock for par value. The stated capital of the corporation was established when the stock was first issued. That stated capital was not disturbed when the stock was reacquired. Since the stated capital is not involved in the transaction, there is no need to invoke the concept of par value when the stock is resold.

Because of this distinction, the drafters of the older statutes needed a mechanism to distinguish between authorized but unissued stock—whose sale would affect stated capital—and stock issued but not outstanding—whose sale would not affect stated capital. This distinction was made through the treasury share provisions of the Model Act, and similar provisions in those statutes which followed the Model Act.

Treasury stock, then, is a function of the "stated capital" concept.[53] Significantly, those modern statutes which have abolished the concepts of stated capital and par value have also abolished the treasury stock concept.[54]

The function of treasury stock provides the key to the issue before this court. If § 29–317 exists only to protect the stated capital account, it ought not apply to treasury shares since the trading of treasury shares does not affect the stated capital account. On the other hand, if § 29–317 serves a broader purpose which would be affected by treasury share transactions, it should apply to transactions such as the one at issue here.

### 4. The Purpose of § 29–317

Protecting the stated capital account is clearly *one* purpose of § 29–317. Promissory notes often prove uncollectable. If they are counted as part of the stated capital, creditors and shareholders who relied on their collectability would be misled.[55]

At one time—beginning well after the adoption of the statute at issue here—the Model Act would have supported the interpretation that avoiding the watering of new stock was the *only* purpose of provisions such as § 29–317. A 1960 commentary to the Model Act specified that the Model Act's provision applied only to newly issued

---

**52.** *See In re Fechheimer Fishel,* 212 F. 357 (2d Cir.), *cert. denied,* 234 U.S. 760, 34 S.Ct. 777, 58 L.Ed. 1580 (1914); Glenn, *Treasury Stock,* 15 VA.L.REV. 625, 634 (1929).

**53.** *Bronson v. Bagdad Copper Corp.,* 151 A.2d 677, 679 (Del.Ch.1959) ("Only substantial difference" between treasury stock and authorized but unissued stock is that treasury stock need not be issued at par); Proposed Revised Model Corporation Act [Exposure Draft], Official Comment to § 6.31; H. BALLANTINE, BALLANTINE ON CORPORATIONS 615 (1946).

**54.** CAL.CORP.CODE § 510 (West 1977); Revised Model Business Corporation Act §§ 6.21, 6.31.

**55.** *See Area, Inc. v. Stetenfeld,* 541 P.2d 755, 757–58 (Alaska 1975). The Delaware statute seems to embrace this as the sole policy underlying its ban on promissory notes, since the statute requires cash or equivalent property up to the par value of each share, but permits promissory notes to be used beyond the level necessary to protect the stated capital account.

*See* DEL.CODE ANN. tit. 8, § 152 (1974). The D.C. Code contains no such qualification.

It is not remarkable that most cases facing the promissory note issue employ the concept of stated capital. As we note, the protection of stated capital clearly is one concern of the ban; since the cases reported all deal with newly issued stock—and so properly invoke concerns about stated capital—it is only natural that courts turn first to that concept to justify their reasoning.

What is remarkable is the refusal of many prior courts—even when dealing with a situation where stated capital concerns were paramount—to foreclose the possibility that other policies might also underlie the rule. *See, e.g., Memphis v. Little Rock Ry. v. Dow,* 120 U.S. 287, 7 S.Ct. 482, 30 L.Ed. 595 (1887) (Harlan, J.) ("*One* of the mischiefs sought to be remedied is the flooding of the market with stocks and bonds that do not represent anything whatever of substantial value.") We say no more here—the chief purpose of the ban seems to be to protect the stated capital account, but thorough

stock;[56] a 1969 amendment to the Model Act itself placed this interpretation in the statute.[57]

The district court relied on this subsequent amendment of the Model Act in interpreting the D.C. Code, terming it "legislative history."[58] The district court erred in treating this later commentary—which was issued far too late to benefit the drafters of the District of Columbia statute—as legislative history. This reasoning underlying these subsequent changes can be used, however, much as law review articles are used: as an aid in interpreting an unclear statute. Unfortunately, both the 1960 commentary and the comments explaining the 1969 revision are conclusory in form. No explanation is given as to why the commentators felt treasury stock should be distinguished.

Since then, the Model Act has been revised, and the concepts of both stated capital and treasury stock have been abolished.[59] Under the Model Act as it now stands, all sales of stock would be subject to the ban on promissory notes. A proposed Revised Model Act would permit the sale of stock for promissory notes, but impose special disclosure requirements on such sales that are not applicable to other corporate sales of stock.[60] The California act—which likewise abolishes the concepts of stated capital and treasury shares—bans outright the sale of stock for unsecured first-party promissory notes.[61] Both the Revised Model Act and the California Code suggest that the ban on promissory notes involves interests reaching beyond the sanctity of the stated capital account.

The survival of these provisions reminds that stated capital was never a solitary—or sufficient—bulwark against the dilution of capital. In this century, the nearly universal acceptance of low-par and no-par stocks (and hence the diminishment of "stated capital" as a proportion of the corporation's economic capital) has eroded its utility as even a partial safeguard; today's creditors are more likely to look to recent and projected earnings, the total debt-to-equity ratio, the relationship of cash flow to projected income expense, the ratio of current assets (such as short term promissory notes) to current liabilities, and the general

reflection reveals that the primary purpose never has been and is not now the only purpose.

**56.** Model Act Ann. § 18 (1960). This annotation was not prepared by the drafters of the Model Code, however, but was prepared by ABA staffers, and subsequently reviewed by those members of the ABA committee who were serving when the annotated edition was published. *Id.* at vii.

**57.** Model Bus.Corp.Act Ann.2d § 19 (1971). While no parallel amendment was made in the D.C.Code, this omission is of limited significance since the Model Act amendment was ostensibly only to clarify, not change, the law. However, the omission of the term "issuance" from the original statute might have been read to imply that the provision's scope reached treasury shares. *See* Dahlquist, *Regulation and Civil Liability Under the California Corporate Securities Act: II*, 34 Cal.L.Rev. 344, 376–77 (1946) (argument that term "sold" implies treasury shares, while term "issued" implies new issues only).

**58.** District Court Op. at 6.

**59.** *Changes in the Model Corporation Act—Amendments to Financial Provisions*, 34 Bus.Law. 1867 (1979).

**60.** Proposed Revised Model Business Corporation Act §§ 6.21 (issuance of shares); 6.31 (reacquisition of shares); 16.21 (disclosure to shareholders when shares are purchased for promissory notes). The Revised Model Act would allow the sale of treasury shares for promissory notes, but requires the board to set a present value on the notes at the time of the sale. § 6.21(d). The board may place shares purchased with a promissory note in escrow, restrict subsequent transfer of the shares, or credit distributions against the purchase price until the note is paid; in these cases, the board may cancel the shares in whole or in part if the note is not paid. § 6.21(f). The board must notify the shareholders in writing of the number of shares issued, the consideration received and the valuation put on the consideration. § 16.21.

**61.** Cal.Corp.Code § 409(a). The California Code does permit the sale of stock for secured promissory notes, and permits the sale of stock for third party notes. *Id.* The drafters of the California Code apparently believed that prior California law permitted the sale of stock for any sort of promissory note, a belief that has been criticized. *See* H. Marsh, Jr., Marsh's California Corporation Law § 5.28.

reputation of the firm. Holding out a small "cushion of capital" at best provides slim returns to creditors, and nothing to equity holders who had hoped to see their investment grow. In the current marketplace, as the drafters of the proposed Revised Model Act recognized, reliance on stated capital more often proves misleading than helpful.[62]

The gradual erosion of stated capital as a safeguard has highlighted the other safeguards that have been present all along. The most far reaching of these are the fiduciary duties imposed on certain principals of the corporation; the more recent statutes rely ever more heavily on these duties to prevent corporate misconduct.[63]

As a practical matter, however, the deference shown officers and directors under the "business judgment rule" limits the enforceability of fiduciary duties except in the case of self-dealing or other egregious misconduct. These vague fiduciary duties are therefore supplemented with flat bans against specific kinds of behavior, where a predictive judgment can be made that allowing the practice would more often lead to abuses than to economic gains.

■ The D.C. Code's ban on the sale of stock for promissory notes is such a prophylactic ban. Little of benefit can be expected from allowing the sale of stock for notes. Those notes which promise to be collectable could readily enough be converted to cash,[64] while a tremendous temptation exists to transform promissory notes without real value—especially third party promissory notes—into a more valuable asset by transferring them to the corporation for stock. Selling shares for promissory notes doomed to default harms the corporation in numerous ways: by diluting the equity of the other shareholders, by deceiving investors and creditors through falsely inflating the value of the corporation's assets, and (where, as here, all or almost all of the authorized stock is involved) by causing the corporation to forego other sources of capital.

Another possible rationale for continuing the ban, even where concerns about the stated capital account are not relevant, has to do with the market for corporate control. In some cases, such as the one at issue here, the sale of treasury shares might be sufficient to shift control of the corporation to thepurchaser; in some cases, such as the one at bar, the party purchasing the shares might be a third party friendly to or even associated with embattled incumbent management. Such a transaction—the wisdom of which is cloaked from judicial scrutiny by the business judgment rule—might well suffice to lock in the control enjoyed by incumbent management. When the consideration is merely unsecured promissory notes, this control of the corporation might be acquired without any real assumption of risk by the purchasing shareholder. Such transactions promise to deform the market for control of the corporation, with no offsetting benefits. Given the almost insuperable burdens faced by those who might seek to undo such transactions, the law might well reflect a judgment that a flat ban against such sales would avoid much mischief without frustrating many legitimate transactions.

---

62. Proposed Revised Model Business Corporation Act § 6.21, Official Comment (To the "extent security holders are led to believe [stated capital] provides this protection, these provisions may be affirmatively misleading").

63. For a criticism of this reliance on fiduciary duties, see Branson, *Countertrends in Corporation Law: Model Business Corporation Act Revision, British Company Law Reform, and Principles of Corporate Governance and Structure,* 68 Minn.L.Rev. 53, 54–72 (1983).

64. Most statutes which ban the purchase of shares with promissory notes also ban the pur-

chase of shares with promises of future services. Promissory notes as a class are, however, slightly more likely than future services to lead to fraudulent transactions. If the purchaser's credit is good, he should be able to receive funds for a promissory note from sources other than the corporation. Few other sources would, however, advance funds based on services to be performed to a start-up company. As a result, at least one state now permits the sale of stock for future services. Va.Code § 13.1–17 (1978). *See also* 61 Va.L.Rev. 1650, 1661 (discussing Virginia statute).

These policies underlying the ban embrace interests beyond the protection of the stated capital account, and so the ban applies to treasury stock as well as to newly issued stock. To exclude treasury shares from this important anti-fraud provision would rule into law an exclusion never embraced by the drafters of the D.C.Code, one which ignores important policies underlying the law.

This case, in addition, presents the paradigm situation for treating the sale of treasury shares like new issues when the anti-fraud provisions of the code are involved. In almost every functional way, the shares involved here are like new shares. The shares involved were sold by error to two investors. As soon as the sale was made, the investors asked that the sale be rescinded. So far as the record shows, the shares may never have been voted. The corporation then held the shares for several months, before selling them to a corporation represented by the promoter of the corporation, who throughout had retained effective control of the company. The shares sold represented almost all the voting stock of the corporation.

In some cases, the sale of treasury shares represents a fairly trivial exchange of assets. In this case, it represents the initial sale of control of the corporation. It makes little sense—factually or legally—to say that the sale at issue here ought to be distinguished from the initial issue of shares.

This opinion in no way abolishes the distinction drawn by the District of Columbia Code between treasury shares and newly issued shares. It simply refuses to draw additional distinctions not drawn by the Code. The nub of the difference between treasury shares and newly issued shares, as both the majority and the dissent recog-

nize, is that the concepts of par value and stated capital do not apply to treasury shares. Since the prohibition at issue here does not depend on those concepts, it applies to both types of stock when the seller is the corporation.

### B. *Third Party Note Issue*

The appellees advance as an alternative argument that even if first party promissory notes are not valid consideration for treasury shares, third party promissory notes are. The appellees claim, "Third party promissory notes are intangible property which is acceptable consideration for the issuance of stock." [65]

The appellees' argument is flawed in at least two major respects. First, the Code does permit "intangible property" to be tendered for shares of stock, but the Code then specifically excludes "promissory notes" from those forms of property that can be used to buy shares from the corporation.[66] This court should look to the more specific provision: intangible property is acceptable, so long as the intangible property involved is not a promissory note.

Secondly, the courts uniformly have rejected the argument propounded by appellees when a statute analogous to the one involved here was applicable.[67] In the few other cases facing the same issue, courts have drawn no distinction between unsecured first party promissory notes and third party promissory notes. Those cases that have accepted promissory notes as a valid form of consideration seem invariably to have accepted promissory notes secured by property of real value.[68]

This approach makes sound common sense. The statutory provisions seek to

---

**65.** Brief for Appellees at 14–15.

**66.** D.C.Code § 29–317 (1981 ed.).

**67.** This, in fact, is the result reached in those few cases cited by the appellees. *See Sohland v. Baker,* 15 Del.Ch. 431, 141 A. 277 (1927); *McCarthy v. Texas Loan & Guar. Co.,* 142 S.W. 96 (Tex.Civ.App.1911).

**68.** *Emco, Inc. v. Healy,* 602 S.W.2d 309 (Tex.Civ. App.1980) (shares of stock insufficient collateral to validate sale for promissory notes); *General Bonding & Casualty Ins. Co. v. Moseley,* 110 Tex. 529, 222 S.W. 961 (1920).

prevent shareholders from being defrauded. It takes little ingenuity to transform a first party promissory note into a third party promissory note; in either case, so long as the notes are unsecured the creditors will quite possibly prove unable to collect on the note. The courts have thus drawn the line between secured notes and unsecured notes, and have paid no attention to how many hands the notes have passed through.

## C. Remedy

■■■ The plaintiffs sued in both a direct and derivative posture, seeking a declaratory judgment that the sale of stock to Nilge is void. The sale of stock at issue here was illegal. The illegality does not make the sale void from the outset, but merely makes it voidable.[69] The defect in the sale would have been cured had the $990,000 purchase price been paid in full.[70] While the record suggests strongly that no payment ever was made on any of the notes, the lack of a clear ruling on this point requires us to remand this issue to the district court.

■■■ The plaintiffs also seek reinstatement of those directors and officers who held office prior to the challenged shareholders' meeting at the District of Columbia jail.[71] As the district court observed, however, those officers were also elected by Nilge, and so have no more right to office than those they would displace. As the district court found, "a still earlier slate" would be the proper board.[72] The

**69.** *Area, Inc. v. Stetenfeld,* 541 P.2d 755 (Alaska 1975); *Haselbush v. Alsco of Colorado, Inc.,* 161 Colo. 138, 421 P.2d 113 (1966); *Bankers' Trust Co. v. Rood,* 211 Iowa 289, 233 N.W. 794 (1930).

**70.** *Ramsay v. Crevlin,* 254 F. 813 (8th Cir.1918); *Area, Inc. v. Stetenfeld,* 541 P.2d 755 (Alaska 1975); *Burch v. Exploration Data Consultants, Inc.,* 33 Colo.App. 155, 518 P.2d 288 (1973).

The sale of stock for promissory notes could raise the issue of whether the promissory notes were valued at full value. In this case, Claxton entered uncontroverted testimony at trial that both sides to the transaction valued their notes at their full face value. Supplemental Record on Appeal, Hearing of 17 November 1982 at 148.

**71.** All parties appear to assume that no directors elected by Nilge should remain in office if Nilge's ownership is voided. *See Cullitan v. Stookey,* 95 Ohio App. 97, 113 N.E.2d 254 (1953).

**72.** Even aside from our disposition of the treasury stock issue, it also is clear that the transaction in this case might be voidable under the appellants' second argument—that Claxton failed to show that the transaction was fair. The district court held against the plaintiffs on this ground, finding that Claxton owed no fiduciary duty because—prior to the contested shareholders' meeting in the District of Columbia jail—Claxton was not an officer, director or shareholder of the corporation. District Court Op. at 8 n. 7.

The district court found, however, that Claxton was the promoter of the corporation. *Id.* at 3. It has long been settled law that the promoter of a corporation owes that corporation a fiduciary duty. *Topanga Corp. v. Gentile,* 249 Cal.App.2d 681, 58 Cal.Rptr. 713 (1967). Nor-

mally, that fiduciary duty ceases when the corporation has been established and an independent board of directors takes charge. However, it is also well recognized that establishment of a board of directors which is not truly independent will not suffice to terminate the promoter's fiduciary duty. *Old Dominion Copper Mining & Smelting Co. v. Bigelow,* 203 Mass. 159, 89 N.E. 193 (1909), *aff'd,* 225 U.S. 111, 32 S.Ct. 641, 56 L.Ed. 1009 (1912).

In this case, the district court found that Claxton throughout "controlled Bandeirante, controlled the management of the mining venture and from time to time adjusted the interests of the parties to suit his purpose." District Court Op. at 4. On the facts presented by the district court's opinion, it was almost inevitable that the promoter would continue to exercise such complete control: the officers and directors of corporation were nominal figures wholly responsive to Claxton's will, and they could not be unseated because the voting stock of the corporation was locked in the corporate treasury. Claxton remained—and was sure to remain—in control until the voting shares were resold. The fiduciary duty thus was not, and still is not, terminated.

Claxton was thus a fiduciary of Bandeirante when he acted on behalf of Nilge in its dealings with Bandeirante. In effect, he was an agent for both companies; such behavior raises serious issues of self-dealing. Because of his fiduciary duty, the burden shifts to him to demonstrate the "entire fairness and adequacy of the consideration" received by Bandeirante in the deal. *Mayflower Hotel Stockholders Protective Comm. v. Mayflower Hotel Corp.,* 173 F.2d 416 (D.C.Cir.1949). The district court held that Claxton met his burden because of its finding that the promissory notes were "valid consideration." This holding was in error. Valid consid-

district court did not specify which earlier slate should take office, an omission of some consequence given the "shambles" in which the district court found Bandeirante's affairs. Given the record before us, we are in no position to determine which board of directors ought now to take control of the corporation. We remand the issue of determining the proper board to the district court.

Finally, the district court found at the beginning of trial that Nilge was not an indispensable party to this suit.[73] This ruling was not challenged on appeal. We can imagine several sound reasons for such a ruling: that Nilge's sole North American representative was before the court; that the court foresaw a means to devise relief so as to avoid unfair prejudice to Nilge; or that the broad power of attorney granted Claxton by Nilge permitted the court to grant effective relief without unfairly prejudicing Nilge. We choose not to speculate as to the basis for the district court's order, but merely note that the relief granted by the district court must take into account the fact that Nilge is not a party before the court.

### IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is

*Reversed and remanded.*

MIKVA, Circuit Judge, concurring in part, dissenting in part.

I concur in the majority's conclusion to remand this case to the district court. I would rest, however, on the fiduciary relationship analysis relegated to footnote 72 of the majority's opinion. While that anal-

ysis has only the bare bones of the secondary basis for reversal for which it is offered, it does state good and sufficient reasons for remanding this case to the district court for further proceedings.

It is also possible to base a remand on the majority's suggestion that the Class A voting stock, which is the nub of the controversy, in effect was "newly issued stock." The unusual circumstances under which the original owners of this stock essentially rescinded their agreement to purchase the stock from the Bandeirante Corporation could well lead to a conclusion that this stock never became "treasury stock." Under such an analysis, the entire discussion of whether treasury stock can be sold for promissory notes is *obiter dictum* and should be treated accordingly.

Unfortunately, the majority opinion chooses to elevate its discussion of treasury stock to the *ratio decidendi* of the remand. Because of its expansive and amendatory interpretation of District of Columbia law, I think the majority establishes a mischievous precedent for future application of those sections of the District of Columbia Code that address treasury stock. Accordingly, I dissent from that primary holding.

I believe that Congress intended for the promissory note restriction contained in section 29–317 of the District of Columbia Code to apply only to the issuance of new shares, and that, accordingly, promissory notes may be used to purchase treasury stock. That the opposite conclusion may be advantageous from a policy perspective or may be sympathetic with modern theories of corporate financing does not alter

---

eration is a term drawn from the law of contract. While it might pass muster under contract law to sell the fabled estate of Blackacre for a peppercorn, such transactions raise questions that must be answered when self-dealing by a fiduciary is involved. Because of our decision of the treasury stock issue, however, we need not determine whether the transaction at issue here—the illegal tender of apparently worthless promissory notes for virtually all the voting stock of a corporation—is one a party would have made in an arm's length bargain, nor need we decide whether the proper remedy

would be rescission rather than the more usual remedy of money damages.

Claxton also might have owed Bandeirante a fiduciary duty because of the extraordinary nature of his consulting arrangement, under which he directed all the affairs of the corporation. Claxton apparently functioned as the corporation's management, differing only in that he chose to avoid formal designation as an officer. Because of our disposition of the promissory note issue, we need not reach this apparently novel issue.

**73.** Record on Appeal at 45.

the language or the legislative history of the statute. Such policy arguments, as the Supreme Court recently admonished, are "more properly addressed to legislators or administrators, not to judges." *Chevron USA Inc. v. National Resources Defense Council, Inc.,* — U.S. ——, ——, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984).

As the majority aptly observes, this case turns on the purpose of section 29–317. If Congress only envisioned a provision to protect the stated capital account, then the prohibition on promissory notes is inapplicable to the sale of treasury shares since the consideration received for treasury shares does not affect the stated capital account. *See Majority opinion, supra,* at 1230. If, alternatively, Congress envisioned a broad anti-fraud provision, then the statute should not be limited to newly issued shares. I find no support in the statute or in its legislative history, however, for the broad reading that the majority embraces and the novel interpretation that it affixes to section 29–317.

## I. ANALYSIS

### A. *The Statute.*

The starting point of a search for legislative intent is, of course, the statute itself. Section 29–317, the source of my disagreement with the majority, provides:

> (a) The consideration for the issuance of shares may be paid, in whole or in part, in money, in other property, tangible or intangible, or in labor or services actually performed for the corporation. When payment of the consideration for which shares are to be issued, which, in the case of shares having a par value, shall not be less than the par value thereof, shall have been received by the corporation, such shares shall be deemed to be full paid and nonassessable.
>
> (b) Neither promissory notes nor future services shall constitute payment or part payment for shares of a corporation.
>
> (c) In the absence of fraud in the transaction, the judgment of the board or the shareholders, as the case may be, as to

the value of the consideration received for shares shall be conclusive.

D.C.CODE ANN. § 29–317 (1981).

This section, common to many of the corporation laws of the time, was designed to protect creditors and others from the formation of paper corporations: the stated capital of a newly-formed corporation was to provide a guaranteed contribution of real assets to the new business. This tie-in to stated capital is the main reason why section 29–317 cannot be used in its present form to treat treasury stock or any stock other than newly-issued.

Although paragraph (b) does not specifically limit the promissory note prohibition to the issuance of shares, paragraph (b) must be read in conjunction with paragraph (a) and in light of the concerns that gave rise to the prohibition. Paragraph (a) incorporates the term issuance and, more importantly, suggests that the intended focus of section 29–317 is on those matters that affect the *issuance* of corporate shares. As the majority concedes, the prohibition on promissory notes appears in a "provision otherwise devoted to issuance of stock." *Majority opinion, supra,* at 1229. Thus, the placement of the promissory note prohibition within section 29–317 suggests that Congress intended for the promissory note proscription to be limited to the issuance of new shares.

This conclusion becomes still stronger when the statute is considered in its entirety. The format of the business corporations title of the District of Columbia Code firmly supports the conclusion that the promissory note prohibition extends only to the *issuance* of shares. Section 29–317 appears in a segment of the corporations title that primarily focuses on—and reveals apprehension about—a corporation's stated capital account. The section immediately preceding section 29–317 principally addresses par value, the consideration for the issuance of non-par shares, and the impact of certain transactions on the stated capital account. Each of these subjects is closely associated with the integrity of the stated capital account. That section also address-

es treasury stock, but only to the extent of excluding treasury shares from par value restrictions. Additionally, the section that immediately follows section 29–317 directly addresses the composition of the stated capital account. For example, the statute provides, in part, that "[i]f the shares issued shall consist wholly of shares having a par value, then the stated capital represented by such shares shall not be less than the aggregate par value of the shares so issued." D.C.CODE ANN. § 29–318(a)(1) (1981). By establishing the relationship between the selling price of shares and the stated capital account, the Congress acted so as to ensure that the stated capital account would be more than a mere sham.

The promissory note prohibition thus is sandwiched between two provisions that focus on the stated capital account. Moreover, as indicated above, the general focus of section 29–317 is on the issuance of shares. Thus, it is but a small and logical step to deduce from this statutory framework that the promissory note prohibition must also incorporate a similar concern with the stated capital account. Yet, significantly, only the *issuance* of a corporation's shares affects this account. Treasury shares, in contrast, have no impact whatsoever on the stated capital account and thus are irrelevant to this portion of the corporations title. Accordingly, it would be illogical to conclude that the promissory note prohibition contained in section 29–317 applies to treasury stock. Given the narrow focus of this segment of the corporations title on the stated capital account, the majority's choice of a broad anti-fraud interpretation is especially curious.

## B. *The Legislative History.*

Although somewhat sparse, the legislative history of the promissory note proscription leaves no room for any conclusion other than one in which the promissory note prohibition applies only to the issuance of new shares. Although the House Report makes no specific mention of the promissory note provision, the Report ex-

plicitly identifies the origins of the new District of Columbia corporations bill:

The bill in its present form is patterned after the model business corporation law prepared by the American Bar Association as revised in 1950. It is similar in most respects to the business corporation statutes of Delaware, Maryland, and Illinois.

H.R.REP. No. 1552, 82nd Cong., 2nd Sess. 2 (1952). An examination of the sources referenced by the Congress convincingly demonstrates the limited reach of the promissory note proscription.

### 1. *The model corporation laws.*

The 1950 model business corporation law, to which Congress referred, contains a provision substantially identical to that enacted by Congress. AMERICAN LAW INSTITUTE, MODEL BUSINESS CORPORATION ACT (REVISED 1950) § 18 (1950) ("No promissory notes for future services shall constitute payment or part payment, for shares of a corporation."). In a preface to the official publication of the 1950 Model Act, and in an article accompanying the publication of the 1950 Model Act in a bar journal, Ray Garrett, Chairman of the Division of Corporations of the American Bar Association and Chairman of the Committee on Corporate Laws, notes that the Model Act "prohibits the *issuance* of shares for promissory notes and future services." (emphasis added). AMERICAN LAW INSTITUTE, MODEL BUSINESS CORPORATION ACT (REVISED 1950) iv, x (1950); Garrett, *History, Purpose and Summary of the Model Business Corporation Act,* 6 BUS.LAW. 1, 7 (1950). Given that Mr. Garrett surely knew the technical meaning of the word issuance, and given that treasury shares are defined as *already issued,* it is clear beyond cavil that the drafters of the 1950 Model Act did not intend for the promissory note restriction to extend to treasury stock. Because the 1950 Model Act was cited by Congress as a source of the District of Columbia's corporations title, the interpretation of the Model Act offered by its drafters—interpretations available at the time that Congress acted—must be given considerable weight. Mr.

Garrett's remarks thus lend substantial support to the proposition that the promissory note proscription applies only to new issuances.

The conclusion that the 1950 drafters intended to limit the promissory note proscription to *newly issued* stock is bolstered by subsequent events. In 1960, the American Bar Foundation published an annotated version of the Model Business Corporation Act. Significantly, no substantive changes were made to the text of that section which prohibits promissory note purchases. MODEL BUSINESS CORPORATION ACT ANNOTATED § 18 (1960). Moreover, the Chairman of the Special Committee on Model Corporations Acts was one of the drafters of the 1950 version, and many other drafters of the 1950 version, including Ray Garrett, were involved with the 1960 version. *Id.* at xxiii, xxv.

Against this background, the drafters' commentary in the 1960 version deserves our attention. In one such comment the drafters note: "Nor is the disposition of treasury shares subject to the provisions of section 18 [prohibiting payment in the form of promissory notes or future services] which relates *only to consideration for shares on original issue.*" *Id.*, § 17 commentary at 318. Thus, the commentary indicates that promissory notes may be used to purchase treasury shares. This commentary is presented not as noting a substantive change but merely as incorporating an unremarkable description of the law. *Nothing* suggests that this commentary had any other objective than to reiterate Ray Garrett's statement of ten years earlier that the promissory note prohibition applies only to newly issued stock.

In 1969, the drafters "codified" Ray Garrett's original observation of 1950 regarding the scope of the promissory note prohibition. As amended, the section read:

> Neither promissory notes nor future services shall constitute payment or part payment *for the issuance* of shares of a corporation.

MODEL BUSINESS CORPORATION ACT § 19, at 435 (emphasis added) (2d ed. 1971). As the comments explain: "In 1969 the second paragraph was amended *to make it clear* that the prohibition was directed solely to the payment upon the original issue and not to subsequent sales of shares." *Id.* (emphasis added). The amendment thus did not encompass a substantive change but rather served only as a clarification. Although no parallel amendment was adopted in the District of Columbia, this omission, as the majority admits, is of limited significance since the Model Act amendment was to clarify, not to change, the law. *Majority opinion, supra* at 1231 n. 57.

In sum, we are left with a situation in which Congress adopted a model that *continuously*, albeit with increasing clarity, limited the promissory note proscription to newly issued shares. Accordingly, wherever the policy arguments might finally lie, it is clear that Congress intended for the prohibition on promissory notes to extend only to new issuances. Thus, stock already issued, including treasury stock, can be purchased with promissory notes. Against this background, I find troubling and totally without support the majority's attempt to ignore the history of the model acts on the basis that Ray Garrett's original 1950 commentary was "ambiguous", *see Majority opinion, supra*, at 1227, and on the assertion, contrary to all existing evidence, that the model act's drafters underwent some mysterious modification of policy orientation between 1950 and 1960.

### 2. *Other jurisdictions.*

The House Report also indicates that the District of Columbia's corporations bill is "similar in most respects to the business corporation statutes of Delaware, Maryland, and Illinois." *See* HOUSE REPORT, *supra*, at 2. Thus, an exploration of the law of these states is important to an analysis of the District of Columbia's corporation statute. It is revealing that despite Congress' unambiguous, explicit reference to these three states, the majority fails to cite a single case from Illinois, Maryland, or Delaware that supports its novel interpretation of the promissory note prohibition.

The reason for such omission is clear from the briefest of review of precedents in those states. Had the majority done so, it would have discovered strong support for the proposition that the promissory note prohibition is limited to stock issuances. In Delaware, for example, the promissory note proscription traces to a provision in the Delaware Constitution that specifically focuses on stock *issuances* and not stock resale. The Delaware Constitution of 1897 provides: "No corporation shall issue stock except for money paid, labor done, or personal property, or real estate or leases thereof actually acquired by such corporation." Art. 9, § 3. The case law of that state suggests that the purpose of this prohibition is to avoid the issuance of worthless stock and to prevent the creation of fictitious capital accounts. For example, in *Sohland v. Baker,* 15 Del.Ch. 431, 448, 141 A. 277, 285 (1927), the court concluded that an unsecured promissory note was inappropriate consideration for the purchase of newly issued shares. In explaining its conclusion, the court observed that "[t]he capital stock of a corporation should represent something more than the mere obligations of its subscribers to pay for their stock." *Id.* at 285 (quoting *Washer v. Smyer,* 109 Tex. 403, 211 S.W. 986 (1919)). *See also Recent Cases,* 77 U.PA.L.REV. 285, 286 (1928) (discussing *Sohland* and noting that the purpose of a promissory note prohibition is "to prevent, as a matter of public policy, the 'fictitious' issuing of corporate stock."). Since the sale of treasury shares is irrelevant to a concern with the integrity of the stated capital account, it stands to reason that in Delaware, at least, the prohibition against promissory notes applies only to new issuances.

The majority places heavy reliance on the *modern* statutes of certain states. *See, e.g., Majority opinion, supra,* at 1231, 1232 nn. 61, 62. I would suggest that if modern statutes are to be considered in discerning legislative intent—an analytical approach with which I have great difficulties—Delaware's "modern" approach should be given paramount importance since Congress specifically identified that state as a model. In Delaware, as the majority concedes, the corporations statute embraces the protection of the stated capital account as the sole policy underlying its ban on promissory notes. *See Majority opinion, supra,* at 1230 n. 55 (citing DEL. CODE ANN. tit. 8, § 152 (1974 & Supp.1984)). Since the sale of treasury shares raises no "threats" to the integrity of the stated capital account, the promissory note prohibition logically should have no bearing on the sale of treasury shares.

Moreover, a look beyond the jurisdictions specifically mentioned in the House Report makes it increasingly obvious that promissory note prohibitions invariably are linked to concerns over stated capital accounts. For example, in *Memphis v. Little Rock Ry. v. Dow,* 120 U.S. 287, 7 S.Ct. 482, 30 L.Ed. 595 (1887) (Harlan, J.), the Supreme Court addressed a provision in the Arkansas Constitution prohibiting the issuance of stock except for money received or labor done. The Court noted that that provision "was intended to protect stock holders against spoliation, and to guard the public against securities that were absolutely worthless. One of the mischiefs sought to be remedied is the flooding of the market with stocks and bonds that do not represent anything whatever of substantial value." *Id.* at 298, 7 S.Ct. at 487. This worthless stock issue clearly indicates a fear that becomes acute only when stock is issued, not when treasury stock is sold.

In sum, the states to which Congress pointed yield no support for the majority's position. To the contrary, I believe that evidence strongly suggests that the motivating concern of those who drafted the corporate laws was a desire to prevent the *issuance* of worthless stock. Thus, there is no basis to extend the promissory note proscription to treasury shares.

*C. Judicial Interpretation.*

Finally, the only prior decision that has examined the prohibition against promissory notes and future services contained in the District of Columbia Code is in conflict with the majority position. In *Automated*

*Datatron v. Woodcock,* 84 F.R.D. 408 (D.D.C.1979), the court indicated, admittedly in dicta, that the prohibition applies only to the *issuance* of shares. In that case, the question was whether a transfer of shares in exchange for future services violated section 29–908(d), the predecessor to section 29–317. The court noted that the statutory proscription was not directed at stock already issued.

> While read in isolation subsection (b) of section 29–908(d) is somewhat ambiguous in that it might appear to prohibit all transfers of stock for future services, when considered in conjunction with subsection (a) and (c), which both speak of the issuance of shares by the corporation, as well as with the underlying purpose served by its prohibition—the avoidance of "watered stock," ...—it is clear that *the section should be applied only to corporate issuance.*

84 F.R.D. at 411 n. 2 (emphasis added). Assuming, as we must, that the district court was using the term "issuance" in its technical sense, the court's reasoning applies to the instant case as well: the prohibition extends only to the issuance of stock, and not to stock already issued.

### D. *The Majority Opinion.*

To reach the opposite result, the majority focuses on modern corporation statutes that have abolished the concept of treasury shares and that have prohibited the sale of stock for unsecured promissory notes. *See Majority opinion, supra,* at 1230–1231. The majority places great store in its observation that "the survival of these provisions reminds that the stated capital was never a solitary—or sufficient—bulwark against the dilution of capital." *Id.* at 1231. The majority's analysis falters on two points.

First, the majority's analysis fails because it utilizes the "survival" of modern statutes to demonstrate what Congress intended thirty years ago. Had these statutes been present at the time that Congress enacted the District of Columbia's business corporations bill, then these statutes might be some evidence of the theories of corporate law then present. But this is not the case. The two primary statutes upon which the majority relies—the Revised Model Act and the California statute—were both adopted within the past decade. It is beyond me how the "survival" of these provisions sheds any light whatsoever on Congress' intent in 1954, especially given that the contemporaneous sources point in the opposite direction.

Second, and more important, the majority apparently feels that it can accomplish by judicial fiat what other jurisdictions have done only through legislative acts. To reach its conclusion, the majority emphasizes statutes that have abolished the distinction between treasury shares and newly issued shares. Yet, the District of Columbia's corporations title explicitly maintains this distinction. Thus, the statutes so central to the majority's analysis entail a format far different than the statutory structure existing in the District of Columbia. In essence, then, the majority has molded the District of Columbia's code into the pattern of these other statutes, statutes that reflect an approach to corporation law different than that embodied in the District of Columbia's Code. It is the epitome of improper judicial activism for the majority to modernize the D.C. statute by judicial fiat. However preferable the "modern policy", the change must be made legislatively, as it was in all the other jurisdictions.

### II. CONCLUSION

For the reasons set forth above, I would affirm the district court's holding that the sale of treasury shares in exchange for promissory notes is not precluded by the District of Columbia Code. This conclusion is required by the structure of the District of Columbia's corporations title and by the legislative history. The majority's approach reaches for a modernization of District of Columbia law by judicial amendment that is far beyond our authority.

While I agree that this case must be remanded, I part ways with the majority on the promissory note issue and therefore must respectfully

*dissent.*