942 F.2d 1101
 UNR INDUSTRIES, INC., Unarco Industries, Inc., UNR, Inc.,
UNR-Rohn, Inc. (Alabama), UNR-Rohn, Inc. (Indiana), Jobal
Tube Co., Inc., UNR Products, Inc., Leavitt Structural
Tubing Co., and Folding Carrier Co., Plaintiffs-Appellants,
v.
CONTINENTAL CASUALTY COMPANY, National Surety Corporation,
and Fireman's Fund Insurance Co., Defendants-Appellees.
 No. 90-2188.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 7, 1991.
Decided Aug. 29, 1991.
Rehearing Denied Oct. 3, 1991.
 
 Malcolm M. Gaynor, Schwartz, Cooper, Kolb & Gaynor, Chicago, Ill., Paul A. Zevnik, Michael Y. Horton, Kaye, Scholer, Fierman, Hays & Handler, Washington, D.C., Geoffrey L. Thomas, Paul, Hastings, Janofsky & Walker, Santa Monica, Cal., Ronald M. Oster (argued), Catherine A.L. Farman, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for plaintiffs-appellants.
 Nancy G. Lischer, Robert E. Nord (argued), Vito Masciopinto, D. Kendall Griffith, Hinshaw & Culbertson, Terrence E. Kiwala, Rooks, Pitts & Poust, Thomas L. Aries, Aries, Hoyt & Taden, Gary M. Elden, Donald A. Vogelsang (argued), Margaret B. Jones, Grippo & Elden, Chicago, Ill., for defendants-appellees.
 Kevin M. Forde, Mary Anne Mason, Chicago, Ill., for Legal Representative for Unknown Putative Asbestos-Related Claimants, amicus curiae.
 J. William Cuncannan, Sarah M. Stegemoeller, Defrees & Fiske, Chicago, Ill., for Official Creditors Committee of Asbestos-Related Claimants, amicus curiae.
 Before WOOD, Jr. and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 ESCHBACH, Senior Circuit Judge.
 
 
 1
 UNR Industries, Inc. and related corporations (together, "UNR") manufactured asbestos until 1970. In other proceedings, more than 100,000 people claim that they now suffer disease because of their exposure to this asbestos. UNR's insurance carriers are responsible for at least a portion of these claims, and UNR brought the present suit to enforce what it alleges are the insurers' respective obligations. The District Court, Judge Hart presiding, ably resolved a great many questions and the parties settled others, with nine of the insurance carriers together paying more than $70 million to UNR as a result.
 
 
 2
 Here UNR appeals the dismissal of its claims against two insurers, Continental Casualty Company ("CNA") and National Surety Corporation and its parent corporation (together, "National Surety"). We reverse and remand as to CNA because the District Court's dismissal failed to take adequate account of UNR's bankruptcy reorganization. We affirm as to National Surety because UNR was late in raising and pressing the claim at issue, and the District Court was within its discretion to bar the claim as a sanction.
 
 Jurisdiction and Choice of Law
 
 3
 The District Court had subject matter jurisdiction under 28 U.S.C. § 1334(b), which provides that "the district courts shall have original ... jurisdiction of all civil proceedings ... related to cases under title 11" of the Bankruptcy Code. In general, a "dispute is 'related to' the bankruptcy ... [if] it affects the amount of property available for distribution or the allocation of property among creditors." In re Xonics, Inc., 813 F.2d 127, 131 (7th Cir.1987). The present case is "related to" UNR's previous bankruptcy proceeding under title 11 because this case concerns UNR's interest, if any, in insurance policies that CNA and National Surety issued. The scope of UNR's interest "affects the amount of property available for distribution," establishing the District Court's jurisdiction. We have jurisdiction to hear the appeal of the District Court's final order under 28 U.S.C. § 1291.
 
 
 4
 State law controls the determination of assets in a bankrupt estate, unless federal interests require a different result. Butner v. United States, 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979); see In re Streets & Beard Farm Partnership, 882 F.2d 233, 235 (7th Cir.1989). No such federal interests are present in the current case, so state law applies. UNR and the other parties have relied on Illinois law. We follow their lead because "litigants are, within limits not exceeded here, permitted to designate what law shall control their case." Northwestern National Insurance v. Donovan, 916 F.2d 372, 374 (7th Cir.1990).[1]
 
 UNR's Claim Against CNA
 
 5
 The District Court dismissed UNR's claim for a declaration of CNA's insurance obligations, concluding that the asbestos victims had not yet obtained a judgment or settlement from UNR that would trigger those obligations. The District Court further concluded that, in the future, UNR will be able to enforce CNA's obligations only by proving the amount that specific asbestos victims actually receive on their claims. Memorandum Opinion and Order, April 30, 1990, pp. 6, 8-9. We reverse and remand for further proceedings because the District Court's judgment fails to take adequate account of the effects of UNR's bankruptcy, may confer a windfall on CNA at the expense of the asbestos victims, and improperly prejudges the form of proof that UNR must use.
 
 
 6
 CNA is an excess insurer. That is, it provided UNR with an additional layer of insurance on top of UNR's other, primary insurance policies. The amount of this insurance was $5 million per year for a three year policy period, November 1, 1970 to November 1, 1973. The policy provides in its first sentence that CNA "will indemnify the insured for loss in excess of the total applicable limits of underlying insurance." CNA Umbrella Excess Third Party Liability Policy No. RDU8062037 (the "CNA Policy"), "Coverage", p 1 (emphasis added). The CNA Policy then defines "loss" as "the sums paid as damages in settlement of a claim or in satisfaction of a judgment." Id., "Definitions." Tracking this definition, the "no action" clause of the CNA Policy further provides, "No action shall lie against [CNA] unless ... the amount of [UNR's] obligation to pay shall have been finally determined either by judgment against [UNR] or by written agreement of [UNR], the claimant, and [CNA]." Id., "Conditions," p 7. The threshold question is whether UNR has suffered any "loss" under these provisions. It has. UNR's bankruptcy resulted in a judgment or settlement (which one does not matter) against UNR in the amount of $254 million on the asbestos claims.
 
 
 7
 A brief discussion of the procedure of this case should make this conclusion clear. In 1982, UNR petitioned for bankruptcy reorganization. At the time, the company was faced with about 12,000 asbestos claims--the number has since grown to more than 105,000--and was spending more than a $1 million dollars a month in legal expenses. In an innovative plan, the bankruptcy court approved a reorganization under which UNR transferred about 63% of its stock to a trust (the "Trust"). The Trust operates independently of UNR and for the exclusive benefit of the asbestos victims. In essence, then, the asbestos victims are now UNR's majority owners. The asbestos victims agreed, and the bankruptcy court confirmed, that their claims would "be fully settled and satisfied" by the distribution of UNR's stock to the Trust. Consolidated Plan of Reorganization, March 14, 1989, Article III, confirmed by Confirmation Order, June 1, 1989.
 
 
 8
 This bankruptcy reorganization was a judgment or settlement and so triggers CNA's insurance obligations. The reorganization required UNR to pay a sum certain (the stock, which had a market value of $150 million) in satisfaction of the asbestos claims. The order confirming that reorganization was final and appealable. And the order is binding. The parties may not re-litigate the matter. Under any definition of judgment or settlement, this qualifies. Having suffered an adverse judgment or settlement, UNR has suffered a "loss" within the meaning of the CNA Policy.
 
 
 9
 A further issue is the amount of UNR's loss. CNA's excess insurance was in effect only from November 1, 1970 to November 1, 1973, so the relevant loss is only amounts attributable to that period. CNA argues that the amount of this loss depends on how much money the Trust actually pays to asbestos victims with valid claims for the period in question, and the District Court agreed on this point. See Memorandum Opinion and Order, April 30, 1990, pp. 6, 8-9. But this approach threatens to confer a windfall on CNA at the asbestos victims' expense.
 
 
 10
 The reason for the potential windfall is that UNR paid the Trust only a portion of the asbestos victims' actual damages in the bankruptcy proceedings. This discounting of the asbestos victims' damages had nothing to do with the merits of their claims. The discounting merely reflected the amount of UNR's assets that the asbestos victims could reach. CNA may profit greatly from UNR's bankruptcy if its obligations are based on the arbitrarily discounted amount that the asbestos victims actually receive from the Trust. This profit for CNA would be contrary to both the CNA Policy and Illinois law. CNA Insurance Policy, "Conditions," p 7 (stating, "Bankruptcy ... of the insured ... shall not relieve [CNA] of any of its obligations"); Ill.Rev.Stat., ch. 73, § 1000 (requiring that liability insurance policies contain such a provision); see also Harbor Insurance v. Continental Bank, 922 F.2d 357, 368 (7th Cir.1990) (applying Illinois law and concluding that "[t]he point of [liability] insurance policies ... [is] to eliminate the very solvency risk" that would lead to a settlement limited by the amount of the insured's assets).
 
 
 11
 No guesswork is necessary to determine the amount of this discounting. In UNR's bankruptcy disclosure statement, it reported that its unsecured creditors, excluding the asbestos victims, had $112 million in claims against the company. It further reported that negotiations between the various parties, including the representatives of the asbestos victims appointed by the bankruptcy court, resulted in a valuation of the asbestos claims in an amount "2.27 times greater" than the other unsecured claims, UNR Disclosure Statement, March 14, 1989, p. 11, which yields $254 million as the real value of the asbestos claims. This valuation of the asbestos claims was essential to the division of UNR's stock in the bankruptcy proceedings. Without it, no basis would have existed for dividing UNR's assets one way instead of another.
 
 
 12
 This valuation is binding on CNA despite the "no action" clause of its policy. Again, that clause provides, "No action shall lie against [CNA] unless ... the amount of [UNR's] obligation to pay shall have been finally determined either by judgment against [UNR] or by written agreement of [UNR], the claimant, and [CNA]." See CNA Policy, "Conditions," p 7. Assuming for the moment that the reorganization order was not a "judgment" but only a "written agreement", the "no action" clause would on its face bar suit because CNA was not a party to the agreement. But without dispute, CNA had notice of the bankruptcy reorganization and opportunity to participate. Also without dispute, the valuation of asbestos claims in the reorganization was reasonable. These points would certainly establish a waiver of any "no action" rights if CNA were a primary insurer, with a duty to defend its insured against claims. See, e.g., Maneikis v. St. Paul Insurance, 655 F.2d 818, 827 (7th Cir.1981) (applying Illinois law).
 
 
 13
 Under its policy, CNA had the option not to defend. Instead, it could make UNR defend itself after the exhaustion of UNR's primary coverage and later indemnify UNR for the costs that it incurred. See CNA Policy, "Defense Coverage Endorsement", p 1. We have not found any Illinois cases dealing with an excess insurer's obligations to participate in settlement so as to avoid waiver of its "no action" rights. On the facts of the present case, however, we are confident that an Illinois court would hold CNA's "no action" clause waived. As Illinois courts recognize, "[t]he purpose of the 'no action' clause is to protect the insurer from collusive or overly generous or unnecessary settlements by the insured at the expense of the insurance carrier." Mayfair Construction Co. v. Security Insurance, 51 Ill.App.3d 588, 9 Ill.Dec. 509, 513, 366 N.E.2d 1020, 1024 (1977), quoting DeLuxe Motor Stages v. Hartford Accident & Indemnity, 88 Ill.App.2d 188, 193, 232 N.E.2d 141, 144 (1967). This case presents no such danger because the reorganization could not have taken place with the consent of just UNR and the asbestos victims. UNR's other creditors also had to approve, and they had strong reason to fight for as low a valuation of the asbestos claims as possible. The lower the valuation, the greater the portion of UNR's assets these other creditors could reach. This antagonism of interests removes any significant danger that the $254 million valuation of the asbestos victims' claims might contain any artificial inflation at CNA's expense. In short, CNA is bound by the $254 million valuation of the asbestos victims' claims in the reorganization.
 
 
 14
 For lack of firm facts, we will not attempt to refine this $254 million figure further. We note, however, that this $254 million reflects the value of the asbestos claims as "reduced ... to present value." UNR Disclosure Statement Pursuant to § 1125 of the Bankruptcy Code, March 14, 1989, p. 11. This present value as of 1989 should be adjusted upwards by an appropriate interest rate to reflect the passage of time, because the issue is CNA's current obligation to pay on its insurance policies.
 
 
 15
 Further, the $254 million figure does not include the cost of asbestos claims settled by UNR and its other insurance carriers prior to the reorganization. CNA states in the record that these settlement costs were $8.4 million, see Affidavit of Stephen R. Hoff, Table 9, but we do not decide the actual value. The point is only that the full value of all asbestos claims includes pre-reorganization claims as well. The parties may come up with other, valid adjustments to the $254 million value of the asbestos claims determined by the reorganization. On remand, the District Court should consider such additional adjustments to the extent necessary to determine CNA's obligations.
 
 
 16
 The key question is how much of the $254 million (as adjusted) is allocable to each year that CNA provided its excess insurance. The parties agree that the Illinois Supreme Court's decision in Zurich Insurance v. Raymark Industries, 118 Ill.2d 23, 112 Ill.Dec. 684, 514 N.E.2d 150 (1987) controls this allocation. In Raymark, the Court interpreted the policy terms "sickness," "disease" and "bodily injury" in the context of insurance coverage in asbestos cases. The Court concluded that a " '[b]odily injury' takes place at or shortly after the time a claimant is exposed to asbestos and continues throughout a claimant's exposure to asbestos." 112 Ill.Dec. at 695, 514 N.E.2d at 161. "Disease" is an illness that is "reasonably capable of clinical detection and diagnosis." Id. And " 'Sickness' takes place at any time during which the claimant 'suffers from a disordered, weakened, or unsound condition' before the clinical manifestation of a disease.' " Id.
 
 
 17
 Not surprisingly, UNR and CNA disagree about what portion of the asbestos claims meet the Raymark standards for the policy period. UNR urges 69%; CNA argues that the number is about 3.8%. See UNR's Reply Memorandum in Support of its Motion for Partial Summary Judgment, June 6, 1989, p. 13 (naming 69% figure); CNA's Affidavit of Steven R. Hoff, Tables 5 and 6 (reporting 587 claims out of 15,339 reviewed by CNA as showing evidence of exposure or manifestation during the policy period).[2]
 
 
 18
 To resolve this disagreement, the District Court stated that UNR must prove the amount of the claims falling within the CNA policy period on a case-by-case basis. See Memorandum Opinion and Order, pp. 6, 8-9. UNR counters, with the help of amici representing the present and future asbestos victims, that one of the basic goals of the Trust is to maintain low administrative costs by keeping case-by-case analysis of claims to a minimum. UNR contends that it can use random sampling and/or other statistical analyses to show the percentage of the claims that lie within CNA's policy period.
 
 
 19
 In other words, what kind of proof must UNR present? We do not mean to be glib in responding that the answer lies in the whole of the Federal Rules of Evidence. The point of the Rules is to identify the forms of proof that will "secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of ... the end that the truth may be ascertained and proceedings justly determined." Fed.R.Evid. 102. Statistical evidence may or may not be admissible under these Rules, depending for example on the qualifications of the person who presents it, see Rule 702, and whether the basis for the evidence is of a type reasonably relied on by experts in the field, see Rule 703 & Advisory Committee Note.
 
 
 20
 The District Court may be right that only a case-by-case analysis of the asbestos claims will yield sufficient evidence to show how many of the claims against UNR fall within the CNA policy period under the Raymark definitions. The matter should not be prejudged, however. UNR has the right to present whatever types of proof it thinks appropriate, whether on a renewed motion for summary judgment or in a trial on the merits, and have that proof evaluated for admissibility and persuasiveness when presented. The risk that UNR, like any other litigant, runs is that statistics may be less persuasive than evidence of each individual case. In other words, by relying solely on statistical data, a party risks losing a case that it could have won by going to the expense of more specific proof. But that risk is UNR's to take if it finds appropriate.
 
 
 21
 As an excess insurer, CNA is not responsible for the full amount of the $254 million (again, as adjusted) allocable to each year of its policy period. UNR and CNA agree that CNA's excess insurance policy "required UNR to maintain underlying primary insurance with minimum limits of $500,000. If UNR failed to do so, then CNA would only be liable to the same extent as if the primary insurance had been maintained." Brief and Argument of Defendant-Appellee CNA, p. 24; see UNR's Opening Brief, p. 10; CNA Policy, "Conditions", p 2. On remand, then, the District Court can ignore issues such as whether UNR's underlying insurer actually paid the full amount of its coverage pursuant to its settlement with UNR. Whether or not the underlying insurer performed the obligations within its coverage, CNA remains liable for claims beyond that underlying coverage. Thus, once the District Court determines how much of the $254 million value of all of the asbestos claims is allocable to each year of CNA's policy period under Raymark, CNA is responsible for any amount of this allocation that exceeds $500,000 in any year, subject to its policy limit of $5 million per year.
 
 
 22
 One further qualification applies. It is possible that some claims for which CNA might be liable have been paid by insurers for other years. For example, a person might have been exposed to asbestos in 1962, become sick in 1972, and been clinically diagnosed as diseased in 1975--with insurers for each of these three years being liable for the claim under Raymark. If CNA could prove that other insurance has fully covered the asbestos claims for certain years, then it would not be obliged to give UNR a double recovery simply because claims for the fully covered years also happened to lie within the CNA policy period. The burden of proof on this issue lies with CNA because under Illinois law, "[o]nce the insured has brought himself within the terms of his policy, then the insurer must prove the applicability of an exception in the coverage if it wishes to escape liability." St. Michael's Orthodox Catholic Church v. Preferred Risk Mutual Insurance, 146 Ill.App.3d 107, 100 Ill.Dec. 111, 113, 496 N.E.2d 1176, 1178 (1986).
 
 
 23
 To recap, the bankruptcy proceedings resulted in a judgment or settlement against UNR in the amount of $254 million on the asbestos claims. This $254 million may be subject to some adjustments, but it provides the firm starting point for analysis. CNA's excess insurance coverage was in effect only from November 1, 1970 to November 1, 1973, so the District Court will need to determine how much of the $254 million (as adjusted) is allocable to each year in that period, under the principles stated by the Illinois Supreme Court in Raymark. UNR can try to prove the allocable portion with whatever kinds of proof it chooses to offer, subject to the requirements of the Federal Rules of Evidence. CNA is then responsible for any amounts allocated to its policy period, less the $500,000 in underlying insurance that UNR was required to carry and less the amount of any claims that CNA can prove have already been paid by other insurance carriers, up to its $5 million per year policy limit.
 
 
 24
 These points are clear enough, except for a seeming sticking point that merits a brief aside. Any money that CNA must pay on its insurance policies will go to UNR, not to the asbestos victims directly or even to the asbestos victims' Trust. In part, this distinction is form not substance. Again, the Trust owns 63% of UNR, so any payment to UNR is mostly for the asbestos victims' benefit. But that still leaves 37% of any payment going to UNR's other stockholders. If UNR receives the policy limit of $15 million from CNA and pays this money to its stockholders in dividends, then the 37% owners would receive $5.55 million of the insurance money. These 37% owners, however, never suffered any asbestos injury. Why should CNA pay anything to them?
 
 
 25
 The answer is that the 37% owners have given up something. In the bankruptcy proceedings, the asbestos victims could have received the right to sue CNA directly on the insurance claims. The quid for this quo would have been that the asbestos victims would have received less stock in post-bankruptcy UNR, and the 37% owners would have received more. This arrangement would have caused problems, however, because one of the basic points of the bankruptcy reorganization was to ensure that the asbestos victims would receive majority control of UNR. If the asbestos victims' Trust received less stock, it might not have had majority control, or might have been so close to the line that it would have lost its majority control if the need arose to sell off any shares to raise cash on an emergency basis. In short, the 37% owners have earned their portion of any money that may be due from CNA by foregoing the opportunity to receive more stock in the bankruptcy proceedings.
 
 
 26
 Did the 37% owners of UNR really give up enough shares that they should now be entitled to as much as $5.55 million from CNA? This question might be answerable if we could reconstruct the bankruptcy negotiations and apply hindsight to see who came out the winner. That is not the purpose of this appeal, however. The only point we need to rely on is that the bankruptcy court approved the reorganization plan as fair, and CNA has not contested this finding.
 
 
 27
 Three examples may offer another perspective on why CNA should pay money to the 37% owners. In the first example, suppose that Manufacturer has an insurance policy with Insurer. Victims suffer injuries within the scope of the policy, but Insurer refuses to defend. Victims and Manufacturer settle in good faith for $10 million. Manufacturer can then sue Insurer for indemnity, but its claim is limited to the $10 million it actually paid to Victims for injuries within the scope of the policy. See Hartford Accident and Indemnity v. Gulf Insurance, 776 F.2d 1380, 1382 (7th Cir.1985) (discussing Illinois law). Victims have no further cause of action because they have been fully compensated.
 
 
 28
 The second example has the same facts, but Victims suffer a greater injury. Manufacturer is unable to pay the full amount of damages. Instead, Manufacturer gives Victims $10 million as a partial monetary settlement. Manufacturer should also assign to Victims its right to sue Insurer for the rest of the damage, subject to the policy limit, an assignment that is valid regardless of what the insurance policy may say. See Maneikis v. St. Paul Insurance, 655 F.2d 818, 826 (7th Cir.1981) (stating that "policy provision[s] ... can only prohibit assignment of policy coverage, not assignment of an accrued cause of action."). In this example, Insurer is liable to Victims for their uncompensated injuries, and should also indemnify Manufacturer for the $10 million it paid as partial reimbursement. For a case involving basically these facts, see Maneikis, 655 F.2d at 826-27 (applying Illinois law); see also Harbor Insurance v. Continental Bank, 922 F.2d 357, 368 (7th Cir.1990) (offering the illustration, under Illinois law, that insurers should remain liable for the full $17.5 million of damages in that case even though the plaintiffs might have settled for only $5 million if they had to take account of the defendants' limited assets).
 
 
 29
 The third example is like the previous one. Only now, Manufacturer has a $10 million asset, call it the Hope Diamond, that cannot be divided without diminishing its value. The best arrangement would be for Manufacturer to give the Hope Diamond to Victims as partial settlement, but other creditors also have valid claims to the diamond. One solution would be for Manufacturer, Victims, and the other creditors to agree on a division--Victims receive the Hope Diamond and, say 2/3 of the insurance claim against Insurer, while the creditors receive 1/3 of the insurance claim in exchange for their interest in the diamond. This way, the value of the Hope Diamond is preserved and Victims receive the most value possible in compensation for their injuries. The fact that the creditors receive part of the insurance claim should not diminish the payment due from Insurer. Insurer is paying no more and no less than it did in Example 2.
 
 
 30
 Which of these examples best describes the present case? CNA urges that it is Example 1 because the insured, UNR, is the party making the insurance claim. In line with that example, CNA argues that its insured can only receive indemnification for actual dollars spent in settlement. The key difference, however, is that UNR's bankruptcy settlement was only partial, limited by the assets that UNR had available.
 
 
 31
 Example 2 takes account of this partial settlement, but it envisions that Victims would receive the right to sue the Insurer directly. Example 3, not by accident, is our case. Like this example, the present case involves a partial settlement that includes transfer of an asset that (1) cannot be easily divided and (2) is subject to competing claims. Instead of the asset being "the Hope Diamond", the asset is "majority ownership of post-bankruptcy UNR." Like the Insurer in Example 3, CNA has nothing to complain about. Following a partial settlement, an insurer's obligation is to pay the full, uncompensated balance of a victim's injury, regardless of how the victim has assigned its cause of action.
 
 
 32
 This aside thus leaves unchanged our original conclusions. The bankruptcy reorganization included a judgment or settlement for $254 million that triggered CNA's insurance obligations. This $254 million may be subject to further adjustments, which UNR and CNA can present to the District Court. The District Court then must determine how much of this $254 million (as adjusted) is allocable to the CNA policy period under the principles stated in Zurich Insurance v. Raymark Industries, 118 Ill.2d 23, 112 Ill.Dec. 684, 514 N.E.2d 150 (1987). UNR may try to prove the proper allocable amount through any form of evidence that the Federal Rules allow. Subject to its policy limits, CNA is responsible for any allocated amounts above $500,000 per year that have not been paid by other insurers.
 
 UNR's Claim Against National Surety
 
 33
 UNR claims that another insurer, National Surety, failed to honor the "contractual" liability portion of a primary comprehensive general liability policy for the years 1945-48. The District Court dismissed this claim, relying on a number of alternative reasons. The District Court held that UNR raised its contractual liability claim too late; that UNR's own evidence regarding other types of coverage contradicted any theory of contractual liability; and that laches and a special verdict by the jury regarding other coverage barred contractual liability. These alternative holdings present some close questions. We discuss only UNR's tardiness in raising its claim because it is sufficient to support the District Court's dismissal.
 
 
 34
 During the period at issue, National Surety offered various types of insurance coverage. Two of these were "products liability" coverage and "contractual liability" coverage. Under National Surety's standard form insurance contract, both contractual liability and products liability extended to "a warranty of goods or products." Standard Provisions for General Liability Policies, pp 2(a), 2(c) (February 1, 1943). This policy language makes both contractual and products liability coverage potentially applicable to the asbestos claims in this case.
 
 
 35
 The problem is that UNR focused on products liability during discovery and hundreds of pages of pretrial briefs, raising contractual liability for the first time in a proposed pretrial order. The District Court concluded:
 
 
 36
 UNR has inexcusably delayed in raising the issue of contractual liability insurance.... UNR waited until March 20, 1986 to first mention this specific type of coverage--almost three years after the dispute began, more than one year after the close of discovery on the expedited issues, and four months after a discovery cutoff. UNR's assertion of its contractual liability theory for the first time in the final pretrial order simply came too late.
 
 
 37
 Memorandum Opinion and Order (November 8, 1988), p. 15. A trial judge is of course in the best position to evaluate the impact on the proceedings from the introduction of a new issue or theory in midstream. We review for abuse of discretion, see, e.g., Bohen v. City of East Chicago, 799 F.2d 1180, 1184 (7th Cir.1986), and affirm.
 
 
 38
 Again, this case involved numerous issues and defendants. Eight years have passed since UNR and the insurance companies first filed their adversary claims in the bankruptcy proceedings. If the District Court lacked the power to bar the parties from raising new theories, and new variations of theories, years into the litigation, then this case could have continued far longer. Justice delayed would have been justice denied for asbestos victims who would never have lived to see this case come to judgment because of the delay.
 
 
 39
 Beyond dispute, district courts have inherent authority to dismiss a claim for lack of prosecution. See Chambers v. Nasco, Inc., --- U.S. ----, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991); Link v. Wabash Railroad Co., 370 U.S. 626, 630-631, 82 S.Ct. 1386, 1388-1389, 8 L.Ed.2d 734 (1962). UNR's Complaint contained broad language about "primary liability coverage" that was probably adequate pleading for purposes of a contractual liability claim. But as the District Court concluded, UNR did essentially nothing to pursue contractual liability for the next three years. Whether this be called raising the claim "too late," or raising it on time and leaving it lie "too long," the result is the same. The District Court was within its discretion to bar the claim.
 
 Conclusion
 
 40
 For the reasons stated, the District Court's judgment dismissing UNR's claim for declaratory relief against CNA is REVERSED and REMANDED WITH INSTRUCTIONS. The District Court's judgment dismissing UNR's claims against National Surety is AFFIRMED. We emphasize that Circuit Rule 36 shall not apply on remand. Each side is to pay its own costs of appeal.
 
 
 
 [1]
 A further point is that the basis of the current claims is UNR's First Amended Adversary Complaint, filed in 1984, in which UNR seeks a declaratory judgment under 28 U.S.C. § 2201, and other relief not at issue here. This request for a declaration is common practice in insurance disputes, and does not impair jurisdiction. See ACandS, Inc. v. Aetna Casualty and Surety Company, 666 F.2d 819, 822-23 (3rd Cir.1981). Such a declaration is often essential to settlement with the injured party, id., at 823, and in many cases to determining the insurer's duty to defend an underlying suit. In the seven years since UNR filed its amended complaint, however, so many other issues have been resolved that the declaratory posture of UNR's claim has probably stopped serving any purpose. On remand, the District Court may consider allowing--or requiring--UNR to amend its pleadings to make the remaining portion of the case a straight action for damages
 
 
 [2]
 We note that both sides appear to be fudging on their numbers. UNR's 69% figure includes claims in which the victim was exposed to asbestos prior to CNA's policy period and manifested sickness or disease after that policy period. See UNR's Reply Memorandum in Support of its Motion for Partial Summary Judgment, June 6, 1989, pp. 13-4 n. 12. Such victims were subject to "exposure-in-residence" during the policy period, that is, had asbestos fibers in their lungs and possibly causing damage during that time. Under Raymark, however, exposure-in-residence does not count as a trigger for insurance liability. See Raymark, 112 Ill.Dec. at 694-695, 514 N.E.2d at 160-161. (UNR briefly argues the issue, but we affirm the District Court's interpretation of Raymark in all respects)
 CNA also appears overly optimistic in its presentation of the numbers. CNA reviewed 15,339 of the claims against UNR and concedes that 587 of these claims, 3.8%, assert exposure or manifestation within the Raymark criteria. But CNA generally counted claims as within Raymark's definitions only "if the file contained documents in addition to a complaint which contained information about exposure to UNR asbestos or manifestation of sickness or illness." Affidavit of Steven R. Hoff, October 25, 1989, p 4 (emphasis added). Thus, CNA is not counting claims in which only the complaint alleges exposure or manifestation during the policy period. In fact, by CNA's own count, the majority of claims do not even include a complaint, id., at Table 4, as would be expected given the stay of all litigation that accompanied UNR's bankruptcy petition.
 It is no surprise, then, that not many claims contain the additional proof for which CNA was looking. Along these lines, CNA admits that 10.2% (339 out of 3,325) of the closed, prebankruptcy claims contain evidence that would place them within CNA's coverage. Id., at Tables 6 and 7. These cases should have the most complete documentation and so might give the best idea about the nature of the claims as a whole. If so, CNA loses this case on remand. At an unadjusted value of $254 million for the asbestos claims, CNA's $15 million in coverage would almost certainly be exhausted if 10% of the claims (that is, about $25 million worth) fall within CNA's policy period. We say "almost certainly" because, as discussed in the text, it is still possible that some claims would have already been paid by other insurance.