Enterasys v. Gulf Insurance, et al.  CV-04-027-SM  03/29/05  P

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Enterasys Networks, Inc.,
     Plaintiff

     v.                                    Civil No. 04-27-SM
                                           Opinion No. 2005 DNH 050P
Gulf Insurance Company and
Clarendon National Insurance
Company,
     Defendants


**O R D E R**


     After settling a securities class action by agreeing to pay

the class members a combination of cash and stock, Enterasys

Networks, Inc. ("Enterasys") filed suit[1] against various

insurance carriers seeking a declaratory judgment of coverage

(Count I) and damages for breach of contract (Count II), breach

of the duty of good faith and fair dealing (Count III), and

violation of the New Hampshire Consumer Protection Act (Count

IV).  Before the court are: defendants' motion for judgment on

the pleadings on Counts I and IV (document no. 15);[2] Enterasys'

_____

     [1] This suit was removed from the New Hampshire Superior
Court.

     [2] Defendants move for judgment on the pleadings on Count I
on grounds that plaintiff's petition for declaratory judgment is

motion for partial summary judgment (document no. 21);[3] Gulf's
cross-motion for summary judgment (document no. 29);[4] and
Clarendon's motion for partial summary judgment (document no.
30).[5]

## Discussion

Review of the extensive memoranda filed by the parties
discloses that although they raise a number of secondary issues,
they engage, primarily, on one major issue.  The critical issue
presented in the cross-motions for summary judgment is whether,
under Gulf's and Clarendon's excess insurance policies, Enterasys
suffered a loss when it committed to issue Enterasys shares to

---

untimely under N.H. REV. STAT. ANN. (RSA) § 491:22 and move for
judgment on Count IV on grounds that the insurance trade is
categorically exempt from the Consumer Protection Act's
requirements.

[3] Enterasys moves for summary judgment with respect to
insurance coverage for that part of the settlement in the
underlying securities class action that will be satisfied by
transfer of Enterasys stock.

[4] Gulf moves for summary judgment on the issue of loss,
claiming Enterasys did not suffer an insurable loss, within the
meaning of the policy it issued, when Enterasys transferred (or
transfers) stock to the settling plaintiffs in the securities
class action.

[5] Clarendon moves for partial summary judgment on the issues
of loss, exhaustion, and consent.

the class plaintiffs valued (by a formula agreed upon by the class plaintiffs and Enterasys) at $33 million, as part of the overall class action settlement. Among the secondary issues presented are whether plaintiff's state law declaratory judgment action was filed timely (it matters because plaintiff expects an award of attorneys fees under that claim if it prevails on the coverage issues), whether plaintiff's failure to obtain Clarendon's written consent to the class action settlement, as required, precludes coverage under its policy, and whether coverage under the excess policies has been triggered. Of course, the parties also derive and discuss a host of subordinate issues, but most are either not pertinent in light of the record as currently developed, or moot given the disposition described below.

## A. Policies Triggered?

The basic point of this litigation is to determine whether the Gulf and Clarendon excess insurance policies provide coverage to Enterasys for any part of the underlying class action settlement. Because these are "excess" policies, they follow the primary coverage and are triggered only after the underlying

3

insurance policies have been exhausted.  The parties agree that Gulf's policy provides "fourth layer" coverage and Clarendon's "fifth layer" – Gulf provides $10 million in coverage  after losses of $40 million and Clarendon provides $10 million in coverage after losses of $50 million.

It cannot be determined on this record whether either policy has been triggered.  Enterasys says it paid $17 million in cash and $33 million in its stock to settle the class action, for a sub-total of $50 million in covered losses (several times in its pleadings Enterasys adds those figures and gets $55 million, which presumably represents typographical errors).  In addition, it says it incurred legal expenses in defending the class action of "more than $27 million," for which it also claims coverage. "More than $27 million" might be a big number.  If it was, say, $40 million, then each excess policy would be triggered, without regard to whether the $33 million in stock counts as a loss under the respective policies. On the other hand, if it were a smaller number, say $27.01 million, then only the Gulf policy would be triggered (unless more than $5.9 of the $33 million in stock it issued (or will issue) counts as a loss).  Defendants counter

4

that "less than one half of the more than $27 million" in claimed defense costs "may be deemed reimbursable costs" covered by the terms of the policies. Again, that equally ambiguous number could be outcome determinative of the trigger issue, but the record, as currently developed, does not allow a definitive ruling.

## B. The $33 Million in Stock

With respect to Enterasys' claims for reimbursement of the "loss" associated with paying the class members with company stock, the parties identify what appears to be a somewhat novel question. It is simple to pose but more complicated to answer: Has Enterasys incurred a loss within the meaning of the excess insurance policies[6] by committing to deliver 8,727,851 shares of its stock, valued by the litigants at $33 million, to settle the underlying class action suit? Having carefully considered the opposing memoranda and materials, the court is of the view that Enterasys' distribution and/or issuance of stock to the class

---

[6] For purposes of these excess policies, the term "loss" means "damages, judgments, settlements, Costs, Charges and Expenses . . . incurred by any of the [insureds]." (Defs.' Joint Mem. (document no. 34) at 7 (quoting Edwards Aff., Ex. 3 (Primary Policy, Endorsement No. 5)).

plaintiffs is not a loss within the meaning of that term as used in the policies.

Enterasys' asserted theory of loss is not persuasive. It argues, perhaps tongue-in-cheek, that no distinction can be made between a corporation and its shareholders, and, thus, if the shareholders suffer some economic detriment as a result of the issuance of stock to settle a potential corporate liability, then that loss is suffered by the corporation as well, at least for purposes of obtaining insurance coverage. Extensive discussion of that theory is not required. It is fundamental that a duly organized corporation enjoys a legal identity separate and apart from its shareholders, directors and officers." 1 FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 25 at 476 (1999 rev. vol.); Terry Apts. Assocs. v. Associated-East Mtg. Co., 373 A.2d 585, 588 (Del. Ch. 1977) ("Certainly in the normal course of events a corporate entity must be regarded as more than a mere formality. It is an entity distinct from its stockholders . . . ."). Enterasys' shareholders, by the way, are not named insureds under either excess policy at issue; the corporation is the named insured.

When a corporation issues new shares (up to the maximum authorized number), the value of its assets are not diminished. If corporate assets are worth $100, and 100 new shares are issued and sold, doubling the number of issued and outstanding shares, corporate assets after issuance would still be worth $100 (plus the cash raised from the sale). No loss to the corporation occurs. The new stock issue will dilute the outstanding shares in terms of the percentage of ownership interest each represents, and may dilute those shares in terms of book (but not necessarily market) value (although the corporation's assets would also be enhanced by the sale receipts), but that is a "loss," if at all, experienced by the shareholders, not the corporation.

Generally, shareholders necessarily understand that a corporation may issue shares up to the maximum number authorized by its certificate of incorporation. Shareholders would be hard pressed to complain when that occurs in furtherance of legitimate corporate purposes, such as the settlement of a lawsuit representing a potential corporate liability. More specifically, under the corporate law of Delaware, Enterasys' state of incorporation, the directors are authorized to distribute

treasury stock and issue new stock (up to the limit authorized by the certificate of incorporation) at their discretion, for consideration determined by them. See DEL. CODE ANN. tit. 8, §§ 152, 153(b) and (c), and 161.

It would make no substantive difference whether Enterasys issued and sold new shares into the market and handed over the proceeds to the class plaintiffs, or issued and handed over the stock directly. In either case, the corporation suffers no economic harm – it resolves a potential liability without diminishing its asset value, or worth – its asset-pie remains the same, there are just more (and smaller) slices. And, because the issuance of stock allows Enterasys to benefit the settling class plaintiffs without significant cost to itself, deeming the issuance of stock in settlement to be an insurable "loss" would actually result in an inappropriate windfall for the company. It could hand the stock over to settle the claims, then obtain a cash reimbursement from its insurance company up to the policy limits, in effect forcing the insurance company to underwrite a new stock placement. Under such circumstances the company's irresistible incentive would always be to settle with stock –

8

stock that costs the company very little beyond paper and ink to issue, but which would amount to a guaranteed source of new capital <u>and</u> resolution of a potential liability.[7]

In short, the corporation is a named insured, the shareholders are not; shareholders' losses are not covered by the policies at issue, and the corporation did not suffer any harm, economic or otherwise, when it committed to deliver its own shares to settle the underlying claim, or when it actually delivered some shares, and it will not suffer harm when it completes the agreed-upon delivery.

Some of the stock used to settle the class action was (and apparently will be) treasury shares held by Enterasys. As discussed during the hearing on the pending motions, an interesting argument might be made that treasury shares are of a

---

[7] As a practical matter, insurers would not agree to such a proposed settlement, but the potential for mischief illustrates an important point. Most policies, including those at issue here, include a "no action clause," which requires approval by the insurer of any settlement, or a judgment entered against the insured, as a condition of the insurer's obligation to cover any loss. The obvious purpose of such clauses is to protect the insurer from collusive or overly-generous, or unnecessary settlements by an insured at the insurer's expense. <u>UNR</u> at 1106.

different character than newly issued shares (having likely been bought back from the market by the company using otherwise distributable profits), and perhaps transfer of those shares might be said to constitute an insured loss.

But, for most regulatory and accounting purposes, treasury shares are functionally equivalent to shares that are authorized but unissued. Dividends are not paid on shares held in the treasury, the company cannot vote them, and they are not carried on the corporate books as assets. See 11 FLETCHER §5080.80 ("[treasury shares go into something like a state of 'suspended animation' in that the corporation, although nominally the owner, cannot exercise certain rights of ownership, such as the right to vote or to receive dividends") (citing Public Inv. Ltd. v. Bandeirante Corp., 740 F.2d 1222, 1227 (D.C. Cir. 1984); Kirschenbaum v. Comm'r, 155 F.2d 23, 25 (2d Cir. 1946)); III COX & HAZEN ON CORPORATIONS § 21.09 (2d ed. 2003); "Treasury shares are indeed a masterpiece of legal magic, the creation of something out of nothing. . . . Treasury shares carry neither voting rights nor rights to dividends or other distributions. Their existence as "issued shares" is pure fiction."); 18A AM. JUR. 2D

Corporations § 367 (2004) ("Treasury stock is generally regarded as not an outstanding obligation of the corporation . . ."). As the Bankruptcy Appellate Panel for the First Circuit has explained:

> The purchase by the corporation of its own stock is a form of shareholder distribution from which the corporation receives nothing. B. Manning, A Concise Textbook on Legal Capital, at 130 (1977). . . .
>
> . . . Regardless of whether Edward's ownership interest had any tangible value to him, the stock was worthless to the corporation. "Treasury stock is not generally considered an asset, because it is widely held that a corporation cannot own a part of itself." M. Miller, Comprehensive GAAP Guide, at 38.04 (1979).

Consove v. Cohen (In re Rocco Corp.), 21 B.R. 429, 434 (B.A.P. 1st Cir. 1982). Finally, under Delaware law, "[s]hares of its own capital stock belonging to the corporation . . . shall neither be entitled to vote nor be counted for quorum purposes." In re Best Lock Corp. Shareholder Litig., 845 A.2d 1057, 1085 (Del. Ch. 2001) (quoting DEL. CODE ANN. tit. 8, § 160(c)).[8]

---

[8] The corporate law statutes of Delaware appear to be silent on the question of whether treasury shares are entitled to dividends.

So, for purposes of determining whether Enterasys suffered an insurable loss by transferring stock to the injured plaintiffs, treasury shares are substantively no different from and are treated identically as newly issued shares. Technically, it does not actually matter here, one way or the other, for Enterasys, no doubt aware of the accepted attributes of treasury shares, firmly takes the position that "[T]he distinction between treasury shares and newly issued shares is irrelevant to determining the value of the shares issued to the Class Plaintiffs, and therefore immaterial to the adjudication of Enterasys' motion for summary judgment." (Reply Br. (document no. 39), at 4 n.2.) To be sure, Enterasys makes that comment in the context of its erroneous proposition that harm to the shareholders (equity dilution) is harm to the corporation (insured loss), so too much probably cannot be made of it as a concession. But the point is well taken even outside the context in which it was made, and Enterasys does not argue or suggest that the distribution of treasury shares might constitute a loss, even if the issuance of new shares does not.

12

Enterasys does rely heavily upon UNR Industries, Inc. v. Continental Casualty Company, 942 F.2d 1101 (7th Cir. 1991) to support its basic claim that its issuance of stock to resolve a potential liability qualifies as a cognizable loss to the corporation. But UNR does not support Enterasys' position at all.

UNR involved a rather unique situation. Facing thousands of asbestos-related personal injury claims, UNR sought protection under the bankruptcy laws. Id. at 1104. In that bankruptcy context, an "innovative" reorganization plan was formulated, and approved by the court, under the terms of which the company's assets were used to pay both unsecured creditors and the class of injured plaintiffs. Id.

> [T]he firm and its creditors agreed on a plan of reorganization. The reorganized firm ("New UNR") endowed an Asbestos Disease Trust, which received approximately 63% of the firm's stock to supply additional income. Other creditors received the bulk of the remaining shares in lieu of cash payment. Shareholders retained only 8% of the stock.

In re UNR Indus., Inc., 20 F.3d 766, 768 (7th Cir. 1994). UNR's unsecured creditors' claims were valued at $112 million and the

13

injured plaintiffs' claims at $254 million (or 2.27 times greater than the creditors'). 942 F.2d at 1105. That valuation was deemed both reliable, as the product of arms-length negotiations, and reasonable, given the bankruptcy court's approval. Id. at 1105-06. Based upon that valuation of the respective claims on the estate, 63% of the stock in the reorganized UNR was distributed to a trust for the benefit of the asbestos-claimants (representing a market value of $150 million), and 37% went to the unsecured creditors (about 29%) and former shareholders (about 8%). Id. at 1104.

At issue in UNR was whether the company's excess insurance carrier was required to cover the "loss" associated with the payment of stock to the injured class. Id. The insurer, pointing out that the policy in question "define[d] 'loss' as 'the sums paid as damages in settlement of a claim or in satisfaction of a judgment,'" id., argued that the bankruptcy reorganization constituted neither a judgment nor a settlement. The court of appeals disagreed, holding that "[t]he reorganization required UNR to pay a sum certain (the stock which had a value of $150 million) in satisfaction of the asbestos

14

claims," id. at 1105, and that the final order confirming the reorganization plainly qualified as either a judgment or settlement within the meaning of the policy. Id.

And, the court held (for reasons not pertinent here) that the insurance carrier was liable for the full amount of the agreed upon value of the injury claims – $254 million – not just for the value of the stock in the reorganized UNR transferred to the trust ($150 million), up to the full amount of the policy limits. Id. In other words, the carrier was not permitted to benefit from the discounted payment, which was of course based solely upon the insufficiency of assets in the bankruptcy estate. Id. The court also recognized that the insurance reimbursement would inure to the benefit of the injured class plaintiffs - the new majority owners of the reorganized company. Id. at 1108.

In UNR, quite unlike this case, the company did not issue new shares to resolve a potential liability. It is true that the means by which UNR's assets were distributed, and payment in settlement was made, was unique – the court called it "innovative" – in that the reorganized company was handed over to

15

the creditors and class plaintiffs.  942 F.2d at 1104.  A key point in understanding the critical distinction between UNR and the present case is the concept previously emphasized - that the new reorganized UNR was an entirely different entity - it was not the old bankrupt UNR.

In UNR, the stock transfer represented not an addition of equity holders (slicing the company pie in thinner pieces) while the company retained its present value, as is the case here.  To the contrary, UNR actually "lost" nearly all of its assets, and 63% of that loss was attributable to payment of its settlement obligations to the underlying class action plaintiffs.  Therefore, the "payment" by UNR of 63% of its assets constituted a loss, or economic harm (indeed disastrous economic harm) to UNR, economic harm covered by the excess policy.  The obvious and critical difference between UNR and this case is that the stock issued to the trust for class plaintiffs in UNR was stock in the new, reorganized company.  The old UNR - the bankrupt debtor - had its assets collected and paid out.  Issuance of 63% of the stock in the new UNR to class plaintiffs was simply a convenient

16

short-hand means of selling and paying out corporate assets. It is plain that the old UNR suffered a dramatic loss.

Here, Enterasys is not handing over corporate assets to satisfy liability claims. Rather, it is simply issuing authorized new shares to the class plaintiffs - diluting the equity ownership interest represented by each share already outstanding, but not diminishing the value of, or giving up any interest in the assets owned by the corporation. Enterasys' corporate worth or value has not and will not be adversely affected by the distribution or issuance of stock in satisfaction of its settlement obligations. Since Enterasys has not and will not suffer a loss, much less one cognizable under the pertinent excess policies, as a result of its issuance of stock in compliance with its settlement obligations to the class plaintiffs, the carriers are entitled to partial summary judgment on that issue.

## C. Timeliness of the State Declaratory Judgment Action

In their motions for judgment on the pleadings, Gulf and Clarendon seek a ruling that Enterasys filed its state

17

declaratory judgment claim too late.  It may, but may not, matter in the end.  It matters to the extent Enterasys hopes to obtain coverage, because success on that issue would, under the state statute, entitle it to attorneys' fees associated with bringing the coverage suit.

At this point, however, it appears that material issues of fact may preclude summary judgment.  It is undisputed that plaintiff's declaratory judgment action was filed approximately thirteen months after the first-filed underlying action, Roth v. Enterasys Networks, Inc., which puts the filing of the declaratory judgment action well outside the six-month time limit specified in RSA 491:22.  However, there appear to be factual disputes about whether Roth, or some later filing, such as the First Consolidated Class Action Complaint, constitutes the "writ, complaint, or other pleading initiating the action that [gave] rise to the question [of coverage]," RSA 491:22, as well as disputes over when the facts giving rise to the coverage dispute became "known to, or reasonably discoverable by" defendants.  Id.

In any event, it has yet to be established that Gulf's or Clarendon's excess policies are triggered. That matter seems now to be a function of what portion of the "more than $27 million" claimed in defense costs actually qualify as reimbursable defense costs under the respective policies. Prudential case management suggests that the parties, counsel, and the court will all be better served by first resolving that critical issue, for it may well resolve the litigation with respect to one or both of the excess carriers.

Defendants' motion for judgment on the pleadings is denied as to Count I, but without prejudice to renewing it, if and when the issue is no longer potentially moot. However, judgment on the pleadings is granted on Count IV, the Consumer Protection Act claim for reasons that are self-evident. See Bell v. Liberty Mut. Ins. Co., 146 N.H. 190, 194 (2001) ("the insurance trade is exempt from the Consumer Protection Act pursuant to RSA 358-A:3, I").

D.  Consent to Settle

It is undisputed that Enterasys did not obtain Clarendon's prior written consent to the settlement, as required by the policy, and so is not entitled to coverage under the Clarendon policy, absent facts establishing waiver or estoppel.  Enterasys argues that the details of the course of dealing between it and Clarendon ought to give rise to a finding of waiver or estoppel. Perhaps.  But the record is insufficiently developed on the point one way or another.  The briefs are rather conclusory in style and each assumes material facts that appear to be disputed. Clarendon certainly does not agree that it strung Enterasys along, or "dithered" over Enterasys' request for consent (in fact, nowhere does Enterasys definitively assert that it requested consent), nor does Clarendon agree that it affirmatively denied coverage.  Clarendon may well have told Enterasys that its settlement proposal (as it finally evolved) would not reach its coverage level, so no decision needed to be made with regard to consent.  But that is not entirely clear either.

The relevant and undisputed material facts have yet to be completely identified, and the court is not inclined to speculate, on this record, about whether summary judgment is appropriate either way on this issue.  Besides, Clarendon's policy may well be out of reach for other, perhaps more readily ascertainable reasons – depending on whether "more than half of more than $27 million" qualifies as reimbursable costs of defense under the pertinent policies.

Summary judgment on a lack of consent theory is denied, albeit without prejudice to refiling based upon a complete agreed-upon statement of, or establishment of sufficient undisputed material facts.

## Conclusion

For the reasons given, defendants' motion for judgment on the pleadings (document no. 15) is granted in part and denied in part, without prejudice to renewing it; Enterasys' motion for partial summary judgment (document no. 21) is denied; Gulf's cross-motion for summary judgment on the issue of loss (document no. 29) is granted; and Clarendon's motion for partial summary

21

judgment (document no. 30) is granted regarding the issue of loss, but otherwise denied.

**SO ORDERED.**

                              _____
                              Steven J. McAuliffe
                              Chief Judge

March 29, 2005

cc:  Doreen F. Connor, Esq.
     John V. Dwyer, Esq.
     John M. Edwards, Esq.
     John R. Gerstein, Esq.
     Janet R. McFadden, Esq.
     James C. Wheat, Esq.